## IN THE CIRCUIT COURT OF TISHOMINGO COUNTY, MISSISSIPPI

MISSISSIPPI SILICON HOLDINGS, LLC,     )       USDC No. 1:18cv231-SA-DAS

         Plaintiff,    )

v.    )      CIVIL ACTION NO. CU18-0152PT

AXIS INSURANCE COMPANY    )

         Defendant.    )

### COMPLAINT – JURY TRIAL REQUESTED
### (DECLARATORY JUDGMENT AND BREACH OF CONTRACT)

COMES NOW, Plaintiff, Mississippi Silicon Holdings, LLC ("MS Silicon" or "Plaintiff") in the above-styled and numbered cause of action and files this Complaint against AXIS Insurance Company ("AXIS" or "Defendant") and in support of its Complaint would show unto the Court the following:

### PARTIES

1.     Plaintiff, MS Silicon, is a Delaware limited liability company with its principal place of business in Burnsville, Mississippi.

2.     Defendant, AXIS, is an insurance company licensed with the Mississippi Department of Insurance and may be served with service of process on United States Corporation Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39110.

### JURISDICTION OF VENUE

3.     This Court has jurisdiction over this matter pursuant to Miss. Code Ann. § 9-7-81 and venue is proper in this Court pursuant to Miss. Code Ann § 11-11-3.



EXHIBIT
1



FILED

NOV 0 7 2018

DONNA HENRY DILL
CIRCUIT CLERK
TISHOMINGO COUNTY, MS.

## FACTS
## THE INSURANCE POLICY

4.     At all relevant times, MS Silicon was insured by AXIS' crime coverage policy, Policy No. MCN6239381/01/2017, Policy Form Privatus Platinum, covering the term of July 1, 2017 to July 1, 2018 (the "Policy"). A true and correct copy of the Policy is attached as Exhibit A.

5.     The Policy provides for commercial crime coverage via its crime coverage section.

6.     More specifically, the crime coverage part insures losses due to **Computer Transfer Fraud Coverage** (insuring agreement F.1), **Funds Transfer Fraud Coverage** (insuring agreement G.1.), and **Social Engineering Fraud Coverage** (insuring agreement G.2, 3).

7.     The Policy's **Computer Transfer Fraud Coverage** carries a per occurrence limit of $1 million with a $10,000 retention for each loss.

8.     The Policy's **Funds Transfer Fraud Coverage** carries a per occurrence limit of $1 million with a $10,000 retention for each loss.

9.     The Policy's **Social Engineering Fraud Coverage** carries a per occurrence limit of $100,000 with a $25,000 retention for each loss.

10.    Under the Policy's **Limits Of Insurance, Retentions And Reimbursements Section A.1. Crime Coverage Part**, the limits of insurance for each loss for each coverage in the crime coverage part is the most the insurer will pay for each loss under such coverage and if a single loss is covered under more than one coverage, the limits of insurance that apply to such loss will not exceed the highest limit of insurance for each loss that applies.

11.    MS Silicon has satisfied all of its obligations under the Policy, including, but not limited to, the timely payment of annual premium and the proper reporting of its losses under the Policy.

## II. THE LOSS

12.     MS Silicon operates its production at a plant in Burnsville, Mississippi and produces silicon metal products.

13.     As part of its business, MS Silicon purchases graphitized carbon electrodes from a Russian supplier named Energoprom Group.

14.     Since 2015, Energoprom has been a supplier to MS Silicon and regularly ships materials ranging in invoice values between $600,000 and $800,000 per month.

15.     In October 2017, MS Silicon was routinely corresponding with Olga Rozina in the Export Department of Energoprom regarding shipments and payments of invoices.

16.     On October 23, 2017, an accounting official with MS Silicon received an email from Olga Rozina advising that Energoprom was having issues with its payment system and that MS Silicon payments should be sent to an agent collector's account.

17.     This email provided details for a new wire transfer account, was transcribed on Energoprom letterhead, was signed by an Energoprom executive known to MS Silicon, had an Energoprom corporate seal, and was sent from what appeared from Olga Rozina's regular email address.

18.     In response, the responsible MS Silicon accounting official sent a separate, unconnected email to Olga Rozina email that had regularly been used for communication, requesting confirmation of the new wiring instructions. Additional MS Silicon and Energoprom purchasing individuals were copied on this confirming email.

19.     The accounting official received a response to the confirming email confirming the new wiring instructions. The responsible MS Silicon accounting official then wired a payment of $250,030 on October 27, 2017 which wire was confirmed by MS Silicon's bank.

20.     On November 17, 2017, MS Silicon received another email from Olga Rozina's email requesting payment on unpaid invoices. In response, the MS Silicon accounting official wired a $775,851.13 payment to the new account. The information confirming the wire transfer was forwarded to other MS Silicon personnel and to Energoprom purchasing agents.

21.     On December 11, 2017, Energoprom communicated by phone and email to MS Silicon that it had received neither the October 27, 2017 nor the November 17, 2017 wire transfers, and when MS Silicon told Energoprom the payments had been made, Energoprom told MS Silicon that it did not send any new wiring instructions and that it had not received the payments or the confirming emails.

22.     MS Silicon advised its bank and the FBI that it had been the victim of computer fraud and that fraudsters had obtained $1,025,887.13 from MS Silicon.

23.     Through a forensic investigation MS Silicon confirmed that the bad actors breached the MS Silicon computer system gaining access to the system in a manner that allowed the bad actors to monitor and redirect email conversations going to and from MS Silicon. The bad actors established the ability to insert new information into existing email chains between MS Silicon and Energoprom and to embed false domain names in existing email chains. MS Silicon made the transfers in question directly due to the false information and data inserted into its computer system through the efforts of the bad actors.

24.     On December 12, 2017, MS Silicon properly reported this loss to AXIS and subsequently submitted the requested claims form to AXIS for the $1,025,887.13 loss.

25.     AXIS, in March of 2018, advised that the only coverage available under MS Silicon's AXIS policy was a $100,000 limit for social engineering.

26.    In April of 2018, MS Silicon advised AXIS there was coverage available under the computer transfer fraud coverage and policy funds transfer funds coverage as well, mandating $1 million of coverage for the loss.

27.    In June of 2018, AXIS refused to pay the $1 million limit available for the loss and denied any coverage under the AXIS policy except the $100,000 limit for social engineering.

28.    The Policy defines computer system as:

> 1. Computer hardware, software and all components thereof linked together through a network of devices accessible through the internet or the insured entity's intranet or connected with data storage or other peripheral devices that are operated by and either owned by or leased to the insured entity and used to collect, transmit, process, maintain, store and retrieve electronic data …

MS Silicon's email system is software linked through a network of devices and accessible through the internet and thus is part of MS Silicon's computer system as defined in the Policy. Based upon the facts of the MS Silicon claim, MS Silicon's computer system was accessed and invaded by criminal third parties who were able to breach the MS Silicon computer system allowing these parties to monitor and redirect email conversations going to and from MS Silicon. The bad actors were able to insert new information into existing email chains, and to embed false domains into existing emails chains.

29.    The AXIS policy additionally defines **Computer Transfer Fraud** as:

> **The fraudulent entry of information into or the fraudulent alteration of any information within a computer system.**
> (Emphasis added).

Those bad actors entered fraudulent payment and order details into MS Silicon's computer system and fraudulently altered pre-existing information in the email portion of MS Silicon's computer system. As a result of the fraudulent entry and alteration of the information in the email portion of the computer system, the incident qualifies as Computer Transfer Fraud.

30. Under the **Limits Of Insurance, Retentions And Reimbursement** provisions of the policy, specifically **Provision A. Limits Of Insurance 1. Crime Coverage Part,** the Policy provides:

> The limits of insurance for each loss, for each coverage in the crime coverage part is the most the insurer will pay for each loss under such coverage or with respect to the investigation expense coverage, fraud covered expenses in connection with each covered loss under any other coverage. **If a single loss is covered under more than coverage, the limit of insurance it applies to such loss will not exceed the highest limit of insurance for each loss that applies.** (Emphasis added.)

This provision confirms that AXIS recognized in drafting its Policy that a particular loss might fall under more than one coverage under the **Crime Coverage Part** and specifically provided that the loss will be insured at the highest limit of the coverage parts that apply.

31. Under the **Crime Coverage Part F., Computer Crime Coverages 1., Transfer Fraud,** the AXIS policy provides:

> Insurer will pay for loss of or loss from damage to covered property[1] resulting directly from computer transfer fraud that causes the transfer, payment or delivery of covered property from the premises or transfer account to a person, place, or account beyond the insured entity's control without the insured entity's knowledge or consent.
>
> [1] The policy defines covered property means "money, securities, or property."

The criminal third parties involved in the MS Silicon loss were able to fraudulently enter and alter information in the MS Silicon computer system which constitutes computer transfer fraud. This computer transfer fraud caused the transfer and payment of money (covered property) from MS Silicon's account to an account outside of MS Silicon's control and without MS Silicon's knowledge or consent.

32.    Under **Section G., Fraudulent Transfer Coverage**, the AXIS policy provides under **G. 1., Fund Transfer Fraud** that:

> The insurer will pay for loss of money or securities resulting directly from the transfer of money or securities from a transfer account to a person, place or account beyond the insured entity's control, by a financial institution that relied upon a written electronic, telegraphic, cable, or teletype instruction that purported to be a transfer instruction, but, in fact, was issued without the insured entity's knowledge or consent.

The MS Silicon transfer meets the definition of funds transfer fraud under the AXIS policy in that the specific transfer instruction to the financial institution in question was, in fact, issued without MS Silicon's knowledge or consent because MS Silicon did not know or consent to the transfer of this money to criminal third parties and their bank account.

33.    The AXIS policy **Social Engineering Crime Coverage** also provides coverage for the MS Silicon loss as monies were transferred by MS Silicon to criminal third parties through the fraudulent activity committed through the MS Silicon computer system; however, because the policy allows for the higher coverage to apply with the loss meets the requirements of more than one category, the larger of the two limits – for computer transfer fraud – applies. .

## COUNT ONE
## DECLARATORY JUDGMENT

Plaintiff incorporates and realleges paragraphs 1 through 33 as though fully set forth herein.

34.    By denying coverage under the **Computer Transfer Fraud** and **Funds Transfer Fraud Coverage** parts, AXIS has breached its contract with MS Silicon. AXIS has denied this coverage despite the fact that its Policy provides for coverage and for which no exclusion applies.

35.    MS Silicon requests this Court to declare the rights of the parties under the Policy to determine the coverage which exists for the MS Silicon loss.

36.     This conflict constitutes an actual controversy subject to a binding adjudication by this Court and is subject to Declaratory Judgment pursuant to Mississippi Rule of Civil Procedure 57.

WHEREFORE, MS Silicon prays this Court Order the following relief:

A.     Determining and adjudicating the rights and liabilities of the parties under the Policy of insurance.

B.     Declaring that the MS Silicon claim is covered under the **Computer Transfer Fraud** and **Funds Transfer Fraud Coverage** parts of the Policy.

C.     For such other and further relief as is just and equitable, including, but not limited to, the costs and attorneys' fees permitted under Mississippi law.

**COUNT TWO**
**BREACH OF CONTRACT**

Plaintiff incorporates and realleges paragraphs 1 through 36 as though fully set forth herein.

37.     A valid and enforceable policy of insurance was entered into by the parties.

38.     MS Silicon has fully performed its obligations under the policy of insurance, including timely payment of all premiums due and timely reporting of all occurrences of loss under the policy.

39.     Each occurrence took place during the effective term of the Policy, was reported during the Policy, and was a covered loss for which no exclusion applies.

40.     There has been no breach of the Policy by MS Silicon.

41.     No reasonable interpretation of the Policy permits AXIS' denial of coverage for MS Silicon's claim under the **Computer Transfer Fraud** and **Funds Transfer Fraud Coverage**.

42.   By denying full coverage and failing and refusing to pay the full limit available for the MS Silicon loss, AXIS has breached its obligations to MS Silicon and is responsible for full payment of the loss, and other costs and attorneys' fees pursuant to Mississippi law.

WHEREFORE, Plaintiff, MS Silicon, demands judgment against AXIS for payment of its loss in the amount of $1 million as well as all other court costs and attorneys' fees incurred by MS Silicon because of AXIS' breach of its contract, prejudgment interest, post-judgment interest and such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs file this jury demand and in so doing respectfully demand a trial by jury on all issues.

Respectfully submitted this the 6 day of November, 2018.

John M. Lassiter MS Bar #102235
Attorney for Plaintiff Mississippi Silicon Holdings,
LLC

**OF COUNSEL:**
BURR & FORMAN LLP
190 E Capitol Street
Suite M-100
Jackson, MS  39201
Telephone: (601) 355-3434
Facsimile: (601) 355-5150



Exhibit A

PRIVATUS® PLATINUM

## DECLARATIONS

SOLELY AS RESPECTS CLAIMS-MADE LIABILITY COVERAGES UNDER THIS POLICY: THIS INSURANCE POLICY PROVIDES COVERAGE ON A CLAIMS-MADE BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD. CLAIMS MUST BE REPORTED TO THE INSURER IN ACCORDANCE WITH THE REPORTING OF CLAIMS AND EVENTS SECTION.

**DEFENSE COSTS ARE INCLUDED IN THE LIMITS OF INSURANCE, AND PAYMENT THEREOF WILL ERODE, AND MAY EXHAUST, THE LIMITS OF INSURANCE.**

| | | | |
|---|---|---|---|
| **INSURER** | AXIS Insurance Company<br>111 S. Wacker Dr., Ste. 3500<br>Chicago, IL 60606<br>*A Stock Insurer* | | |
| **NAMED INSURED** | Mississippi Silicon Holdings, LLC<br>PO Box 316<br>Burnsville, MS 38833 | **BROKER OF RECORD** | AmWINS Brokerage of Illinois, LLC<br>10 South LaSalle, Suite 2000<br>Chicago, IL 60603 |
| **POLICY NUMBER** | MCN623938/01/2017 | **POLICY FORM** | PRIVATUS® PLATINUM |
| **POLICY PERIOD** | *From:* 12:01 a.m. on July 1, 2017 *To:* 12:01 a.m. on July 1, 2018, *at the Named Insured's Address* | | |
| **COVERAGE PARTS OF THIS POLICY** | CRIME COVERAGE PART | | |
| **POLICY PREMIUM** | Base Premium:<br>Premium Attributable to TRIA:<br>Taxes, Surcharges and Assessments, if applicable:<br>Total Policy Premium: | | $3,942<br>*No additional charge*<br>N/A<br>$3,942 |



**Exhibit A**

PRIVATUS® PLATINUM

| CRIME COVERAGE PART | | |
| --- | --- | --- |
| **COVERAGES PURCHASED** | **LIMITS OF INSURANCE FOR EACH LOSS** | **RETENTIONS FOR EACH LOSS** |
| Theft of Insured Entity's Property Coverage | $1,000,000 | $10,000 |
| Theft of Client's Property Coverage | $1,000,000 | $10,000 |
| Forgery of Negotiable Instruments Coverage | $1,000,000 | $10,000 |
| Legal Expense Coverage | $100,000 | N/A |
| Forgery of Payment Card Instruments Coverage | $1,000,000 | $10,000 |
| Inside the Premises Coverage | $1,000,000 | $10,000 |
| In Transit Coverage | $1,000,000 | $10,000 |
| Money Order or Counterfeit Currency Fraud Coverage | $1,000,000 | $10,000 |
| Computer Transfer Fraud Coverage | $1,000,000 | $10,000 |
| Restoration Expense Coverage | $100,000 | $0 |
| Funds Transfer Fraud Coverage | $1,000,000 | $10,000 |
| Social Engineering Fraud Coverage | $100,000 | $25,000 |
| Investigation Expense Coverage | $100,000 | N/A |
| *No Retention applies to loss of any ERISA Plan* | | |

| FORMS |
| --- |
| 1.  Cancellation and Nonrenewal Endorsement – California  AXIS 801 MS (06-15) |

| NOTICES TO INSURER | |
| --- | --- |
| *Send Notice of Claims, Loss, Circumstances To:* | *Send All Other Notices And Inquiries To:* |
| AXIS Insurance<br>Claims Department<br>P.O. Box 4470<br>Alpharetta, GA 30023-4470<br><br>Email: USFNOL@axiscapital.com<br>Phone (Toll-Free): (866) 259-5435<br>Phone: (678) 746- 9000<br>Fax: (678) 746-9315 | AXIS Insurance<br>11680 Great Oaks Way<br>Suite 500<br>Alpharetta, GA 30022<br><br>Email: notices@axiscapital.com<br>Phone (Toll-Free): (866) 259-5435<br>Phone: (678) 746- 9000<br>Fax: (678) 746-9315 |



Exhibit A

# SIGNATURE PAGE

IN WITNESS WHEREOF, the Company has caused the facsimile signatures of its President and Secretary to be affixed hereto, and has caused this policy to be signed on the Declarations by an authorized representative of the Company.

Peter J. Vogt, President                    Andrew Weissert, Secretary



**Exhibit A**
**PRIVATUS® PLATINUM**

## GENERAL TERMS AND CONDITIONS

Except for section and paragraph headings, all words in bold have a special meaning as set forth in the **DEFINITIONS** section. Section and paragraph headings are provided for informational purposes only and do not have special meaning.

In consideration of payment of the premium, and subject to all provisions of this Policy and the DECLARATIONS and Endorsements attached to this Policy, all of which are made a part of this Policy, the Insurer designated in the DECLARATIONS will provide the Coverages included in each **Coverage Part** for which a Limit of Insurance is stated in the DECLARATIONS.

### APPLICABILITY

Except as provided in a specific **Coverage Part**, these GENERAL TERMS AND CONDITIONS apply to all **Coverage Parts** of this Policy. The provisions of a particular **Coverage Part** apply only to that **Coverage Part**. In the event of a conflict between these GENERAL TERMS AND CONDITIONS and the provisions of a particular **Coverage Part**, the provisions in the **Coverage Part** will control for purposes of that **Coverage Part**.

### DEFINITIONS

Whether expressed in the singular or the plural, whenever appearing in bold in this Policy, the following terms have the meanings set forth below.

**Administration** means the following activities with respect to any **Plan**: counseling, or providing interpretations to participants, beneficiaries, or employees; determining or calculating benefits; handling records; effecting enrollments, terminations, amendments, or cancellations of participants or beneficiaries; or preparing or distributing notices.

**Application** means the written application for this Policy, if any, and all information and material submitted or made available by or on behalf of the **Insured** to the Insurer in connection with the underwriting of this Policy.

**Benefits** means any obligation under a **Plan** to a participant or beneficiary of a **Plan** to make a payment of money or property or to grant a privilege or perquisite.

**Bodily Injury** means physical injury to the body, or sickness or disease sustained by a person, including death resulting therefrom, including mental injury, mental anguish, emotional distress, shock, or fright, whether or not resulting from injury to the body, or sickness, disease, or death of any person.

**Breach Preparedness Information Service** means data breach risk mitigation information displayed on the AXIS PRO® e-Risk Hub website.

**Claim** means:

1. with respect to the PRIVASURE COVERAGE PART, an **Enterprise Security Event Claim** or **Privacy Regulation Claim**; or

2. with respect to all **Coverage Parts** other than the PRIVASURE COVERAGE PART, a written demand, including a civil or criminal complaint or similar pleading or any appeal therefrom, for monetary relief or non-monetary or injunctive relief, including a written request to toll or waive a statute of limitations or engage in any alternative dispute resolution; and

3. solely with respect to the MANAGEMENT AND ENTITY LIABILITY COVERAGE PART:

   a. a notice of charges, notice of violation, indictment, information, arrest or extradition warrant or similar charging document by or on behalf of any **Government Authority**;

   b. a written notice of investigation or target letter by any **Government Authority** made (i) solely against any **Insured Individual** or (ii) jointly against the **Insured Entity** and any **Insured Individual** identifying such **Insured Individual** as a person against whom a civil or criminal proceeding may be commenced; and



**Exhibit A**
**PRIVATUS® PLATINUM**

    c.  solely with respect to the **Directors & Officers Liability Coverage** and **Insured Entity Indemnification Coverage**, a subpoena or other written request for information by or on behalf of any **Government Authority** in connection with any covered **Claim** against another **Insured Individual** for a **Wrongful Act**;

4.  solely with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, a fact-finding investigation by or on behalf of the Equal Employment Opportunity Commission, Office of Federal Contract Compliance Programs, or similar **Government Authority** that enforces any law prohibiting discrimination or harassment in employment, or any **Similar Law**, of a complaint or charge received by such agency alleging that the **Insured** has violated such law; and

5.  solely with respect to the FIDUCIARY LIABILITY COVERAGE PART, a fact-finding investigation by or on behalf of the Employee Benefits Security Administration ("EBSA"), Pension Benefit Guaranty Corporation or similar **Government Authority** that enforces any **Employee Benefit Plan Law** of a complaint or charge received by such agency alleging that the **Insured** has violated such law;

provided, however, that **Claim** does not mean:

a.  any routine or compliance audit by or on behalf of any **Government Authority**; or

b.  with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, a grievance or other proceeding under any collective bargaining agreement.

**Claims-Made Liability Coverage** means any Coverage designated as such in any **Coverage Part**.

**Client** means any entity or person to whom the **Insured Entity** has agreed to provide goods or services pursuant to a written contract or in exchange for a fee.

**Computer Program** means a set of related electronic instructions that direct and enable a **Computer System** to receive, process, store, retrieve, send, create, or otherwise act upon **Electronic Data**.

**Computer System** means:

1.  computer hardware, software and all components thereof linked together through a network of devices accessible through the internet or the **Insured Entity's** intranet or connected with data storage or other peripheral devices that are operated by and either owned by or leased to the **Insured Entity** and used to collect, transmit, process, maintain, store and retrieve **Electronic Data**; or

2.  solely with respect to the **Computer System Extortion Expense Coverage** in the PRIVASURE COVERAGE PART, computer hardware, software and all components thereof linked together through a network of devices accessible through the internet or the **Insured Entity's** intranet or connected with data storage or other peripheral devices that are operated by and either owned by or leased to the **Insured Entity** or are operated for the benefit of the **Insured Entity** by a third party service provider and used:

    a.  to provide hosted application services to the **Insured Entity**; or

    b.  to process, maintain, or store electronic data, pursuant to written contract or agreement with the **Insured Entity**.

**Computer Transfer Fraud** means the fraudulent entry of **Information** into or the fraudulent alteration of any **Information** within a **Computer System**.

**Consumer Redress Fund** means those sums the **Insured** is legally obligated to deposit in a fund as an equitable remedy for the payment of consumer claims resulting from an adverse judgment, ruling, or settlement of a **Privacy Regulation Claim**.

**Corporate Information** means any information owned by a third party and in the **Insured Entity's** care, custody, or control that the **Insured Entity** is legally required to maintain in confidence. However, **Corporate Information** does not include **Protected Personal Information** and does not mean publicly available information that is lawfully in the public domain or information available to the general public from government records.



**Coverage Part** means each Coverage Part designated in the DECLARATIONS as a part of this Policy.

**Covered Property** means **Money, Securities,** or **Property.**

**Crisis Management Expense** means the reasonable costs of those services described below incurred by or on behalf of an **Insured Entity,** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer:

1. preparation, distribution and/or transmission of notices of the **Enterprise Security Event** by reasonable means for the purpose of advising those persons whose **Protected Personal Information** may have been improperly accessed, lost or stolen regardless of whether such notice is mandated by law or regulations, provided that such costs are incurred by an **Insured Entity** to mitigate financial, reputational or other harm in connection with an **Enterprise Security Event** that occurs or that the **Insured Entity** reasonably believes has occurred;

2. call center services to answer questions from persons receiving notice in accordance with item 1 above; and

3. design and implementation of a website for advising of any purported access, loss of or theft of **Protected Personal Information;**

provided, however, **Crisis Management Expense** does not mean and does not include **Fraud Response Expense, Public Relations Expense** or **Forensic and Legal Expense.**

**Custodian** means any **Employee** (other than a watchperson or janitor) or any natural person who is an **Owner** or a chief executive officer, chief financial officer, managing member or general partner of the **Insured Entity,** or their functional equivalents, while having care and custody of **Covered Property** inside the **Premises.**

**Cyber Attack** means the intentional and targeted release or insertion of any computer virus, malware, Trojan horse, worm, or other code, script, or software into the **Computer System** for the purpose of gaining or enabling unauthorized access to the **Computer System.**

**Defense Costs** means reasonable expenses incurred in opposing, defending, settling, or appealing covered **Claims,** whether paid by the Insurer or by the **Insured** with the Insurer's consent, including attorney and expert fees; court costs; alternative dispute resolution costs; the cost of appeal bonds or release attachment bonds for amounts within the applicable Limit of Insurance, but the Insurer does not have to furnish these bonds; and expenses incurred by an **Insured Individual** at the Insurer's request, excluding loss of earnings, salaries, benefits, and other compensation paid to any **Insured.**

**Discovery** or **Discovered** means the moment when any **Insured Executive** acquires knowledge that would cause a reasonable person to believe that a loss of a type covered under this Policy has occurred or will occur, regardless of whether the amount or details of such loss are known or unknown.

**Electronic Data** means facts or information converted to a form which is usable in a **Computer System** and stored on electronic processing media for use by a **Computer Program.**

**Employee** means:

1. with respect to the CRIME COVERAGE PART, any natural person who is:

   a. employed by the **Insured Entity** on a full-time, part-time, temporary, seasonal, volunteer, intern, or leased basis, and whose labor or service is directed solely by the **Insured Entity,** including any such person (i) up to 90 days after termination of his or her employment by the **Insured Entity** or (ii) while on leave of absence; or

   b. a duly elected or appointed member of the **Insured Entity's** board of directors, board of trustees, board of managers, or equivalent management board;

   but **Employee** does not mean any agent, broker, or commission merchant of the **Insured Entity,** or any independent contractor of the **Insured Entity** unless described in item a or b above or added by endorsement to this Policy; or



Exhibit A
PRIVATUS® PLATINUM

2. with respect to all **Coverage Parts** other than the CRIME COVERAGE PART, any natural person who was or is:

   a. employed by the **Insured Entity** on a full-time, part-time, temporary, seasonal, volunteer, intern, or leased basis, and whose labor or service during such employment was or is directed solely by the **Insured Entity**; or

   b. contracted by the **Insured Entity** to provide labor or services solely for the **Insured Entity** during the contract term; and

3. solely with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, an applicant for prospective employment by the **Insured Entity**.

**Employee Benefit Plan Law** means any law that regulates **Sponsored Plans**, including the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), the United Kingdom's Pension Scheme Act 1993 or Pensions Act 2004, or Canada's Pension Benefit Standards Act, 1985, or any **Similar Law**.

**Employment Benefits** means perquisites, fringe benefits, deferred compensation, retirement or medical benefits, vacation days, sick days, stock options, or other rights or payments (including insurance premiums) in connection with a **Plan** or arising out of the employment relationship; but **Employment Benefits** does not include salary, wages, commissions, or non-deferred cash incentive compensation.

**Enterprise Security Event** means any of the following:

1. accidental release, unauthorized disclosure, loss, theft, or misappropriation of **Protected Data**, in the care, custody or control of an **Insured Entity** or a **Service Contractor**;

2. alteration, corruption, destruction, deletion, or damage to data stored on the **Computer System**;

3. transmitting or receiving **Malicious Code** via the **Computer System**;

4. unauthorized access to or unauthorized use of the **Computer System** that directly results in denial or disruption of access of authorized parties; or

5. solely with respect to an **Enterprise Security Event Claim**, the **Insured's** failure to:

   a. timely disclose an incident described in item 1 or 2 above in violation of a **Privacy Regulation**;

   b. comply with its own written and published privacy policy, but solely with respect to provisions:

     (1) prohibiting the **Insured** from disclosing, sharing, or selling **Protected Personal Information**;

     (2) requiring the **Insured** to provide access to and correct inaccurate or incomplete **Protected Personal Information**; and

     (3) requiring compliance with procedures to prevent the theft or loss of **Protected Personal Information**.

**Enterprise Security Event Claim** means a written demand for monetary or non-monetary relief, or a civil proceeding, arbitration or any alternative dispute resolution proceeding, including any appeal therefrom, alleging an **Enterprise Security Event**. **Enterprise Security Event Claim** does not include a **Privacy Regulation Claim**.

**ERISA Penalties** means:

1. civil penalties assessed under the following sections of ERISA: section 502(c); section 502(i), but only the penalty of up to 5% of any transaction; or section 502(l)(1)(A), but only the penalty of up to 20% of any applicable recovery amount; or

2. fines or penalties assessed for any unintentional and non-willful violation of any foreign **Employee Benefit Plan Law** that prohibits conduct similar to the conduct prohibited by the ERISA sections listed in item 1 above, provided that no part of the premium for this Policy has been funded, paid, or reimbursed from the funds or assets of any **Sponsored Plan**.



**Exhibit A**
PRIVATUS® PLATINUM

**ERISA Plan** means any **Sponsored Plan** that is required to be bonded under Title 1 of ERISA.

**Expense Coverage** means any Coverage identified as such in any **Coverage Part**.

**Extended Reporting Period** means a designated period immediately following cancellation or nonrenewal of the Policy, during which **Claims** first made against the **Insureds** will be deemed made during the **Policy Period**, but only for **Wrongful Acts, Enterprise Security Events**, violations of **Privacy Regulations, Related Wrongful Acts, Related Events**, or **Related Violations** that first occurred on or after the **Retroactive Date**, if any, and prior to the effective date of cancellation or nonrenewal.

**Extortion Expense** means:

1. those reasonable expenses incurred by or on behalf of an **Insured Entity**, after obtaining the Insurer's prior approval, to evaluate an **Extortion Threat** and to certify that the threat has ended; and

2. those funds paid by the **Insured Entity**, after obtaining the Insurer's prior approval, to a party or parties that have made an **Extortion Threat**.

However, **Extortion Expense** does not include any amounts for, arising out of or in connection with royalties, fees, deposits, commissions or charges for content, goods, or services, **Crisis Management Expense, Fraud Response Expense, Public Relations Expense** or **Forensic and Legal Expense**.

**Extortion Threat** means any credible threat:

1. to commit an attack against computer hardware, software and all components thereof linked together through a network of devices accessible through the internet or the **Insured Entity's** intranet or connected with data storage or other peripheral devices and operated by and either owned by or leased to the **Insured Entity**; or

2. to disseminate **Protected Data** for which the **Insured Entity** is legally responsible;

for the purpose of extorting funds from the **Insured Entity**.

**Financial Impairment** means the status of an organization resulting from:

1. the appointment by any **Government Authority** of any receiver, trustee, examiner, conservator, liquidator, rehabilitator, or similar official to take control of, supervise, manage or liquidate the organization; or

2. the organization becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

**Financial Institution** means any depository institution (including any bank, savings bank, savings and loan association, trust company or credit union), stock brokerage firm, or investment company in which a **Transfer Account** is maintained.

**First Inception Date** means the inception date of the earliest insurance policy the Insurer issued to the **Named Insured** that provides coverage similar to the Coverage afforded under this Policy when there has been uninterrupted coverage by the Insurer for the **Named Insured** from that earliest policy to this Policy.

**First-Party Coverage** means any Coverage designated as such in any **Coverage Part**.

**Forensic and Legal Expense** means the reasonable cost of those services described below incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer:

1. a **System Investigation**;

2. services performed by a licensed legal professional retained by an **Insured Entity** for the purpose of:

   a. determining and advising the **Insured** on the applicability of notice requirements under any **Privacy Regulation**; or



**Exhibit A**
**PRIVATUS® PLATINUM**

    b.  determining and developing the form of notification to comply with applicable notice requirements under any **Privacy Regulation;**

provided, however, **Forensic and Legal Expense** does not mean and does not include **Crisis Management Expense, Fraud Response Expense** or **Public Relations Expense.**

**Forgery** or **Forged** means the alteration of or signing another person's name on a written instrument with the intent to deceive. Mechanically or electronically produced or reproduced signatures will be treated the same as hand-written signatures.

**Fraud Response Expense** means reasonable cost of credit monitoring services and identity monitoring services or **Identity Theft Insurance** for a one year period to **Qualified Persons** incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer for the purpose of mitigating financial loss resulting from disclosure of **Protected Personal Information** due to an **Enterprise Security Event** that occurred or that the **Insured Entity** reasonably believes has occurred. Provided, however, **Fraud Response Expense** does not mean and does not include **Crisis Management Expense, Forensic and Legal Expense,** or **Public Relations Expense.**

**Government Authority** means any federal, state, local, or foreign government, including any court, regulator, administrator, or similar body thereof.

**HIPAA Penalties** means civil penalties assessed for violations of any privacy provision of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Patient Protection and Affordable Care Act, or the Health Care and Education Reconciliation Act of 2010, all as amended.

**Identity Theft Insurance** means an insurance policy that pays benefits, for reasonable and necessary costs to restore an individual's identity, including but not limited to travel costs, notary fees, postage costs, lost wages, and legal fees and expenses associated with such efforts.

**Information** means **Electronic Data** and **Computer Programs.**

**Insured** means the **Insured Entity** and the **Insured Individuals** and, solely with respect to the FIDUCIARY LIABILITY COVERAGE PART, the **Sponsored Plans.**

**Insured Entity** means, individually and collectively:

1.  the **Named Insured** and the **Subsidiaries,** including any such entity as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law; and

2.  solely with respect to the CRIME COVERAGE PART:

    a.  the **Sponsored Plans;** and

    b.  any joint venture managed solely by the **Named Insured** or any **Subsidiary,** in which the **Named Insured** or **Subsidiary** has an equity interest of 50% or less ("Insured Joint Venture"), provided that with respect to any covered loss of an Insured Joint Venture, the Insurer will pay only for that percentage of such loss equal to the percentage of the **Named Insured's** or **Subsidiary's** equity interest in the Insured Joint Venture.

**Insured Executive** means:

1.  any **Insured Individual** while serving as the **Insured Entity's** chairperson of the board of directors, president, chief executive officer, chief financial officer, in-house general counsel, or risk manager; and

2.  solely with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, the **Insured Entity's** head of human resources;

3.  solely with respect to the FIDUCIARY LIABILITY COVERAGE PART, the **Insured Entity's** head of benefits;



**Exhibit A**
**PRIVATUS® PLATINUM**

4.  solely with respect to the CRIME COVERAGE PART, the **Insured Entity's** head of human resources and the non-administrative personnel of the human resources department and risk management department; and

5.  solely with respect to the PRIVASURE COVERAGE PART, the **Insured Entity's** chief operating officer, chief technology officer, chief information officer, chief privacy officer, or chief security officer, and the non-administrative personnel of the offices thereof; or

6.  the functional equivalents of any of the foregoing.

**Insured Individual** means any natural person who was or is:

1.  a duly elected or appointed director or officer of any **Insured Entity** that is a corporation; a manager or managing member of any **Insured Entity** that is a limited liability company; or a general partner or managing partner of any **Insured Entity** that is a partnership or joint venture;

2.  a duly elected or appointed trustee of the **Insured Entity** or member of any duly constituted board or committee of the **Insured Entity**; or

3.  an **Employee**, other than an applicant for prospective employment by the **Insured Entity**, to whom the **Insured Entity** provides indemnification for **Loss** arising from any **Claim** for his or her **Wrongful Act**; or

4.  the functional equivalents of any of the foregoing.

**IRC Tax** means the 15% tax on a prohibited transaction pursuant to section 4975 of the Internal Revenue Code.

**Loss** means:

1.  monetary judgments, awards, or settlements, including pre-judgment interest, post-judgment interest, statutory, punitive, multiplied or exemplary damages, and attorney's fees and expenses included as part of a judgment or award, and **Defense Costs**; and

2.  solely with respect to the MANAGEMENT AND ENTITY LIABILITY COVERAGE PART, fines or penalties, insurable under the law applicable to this Policy, imposed on the **Insured Individual** for any unintentional and non-willful violation of law, including such penalties under the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2(g)(2)(B);

3.  solely with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, liquidated damages awarded under the Age Discrimination in Employment Act, Equal Pay Act, or Family Medical Leave Act; and

4.  solely with respect to the FIDUCIARY LIABILITY COVERAGE PART, **ERISA Penalties**, **HIPAA Penalties**, and **IRC Tax**.

In determining the insurability of punitive, exemplary, or multiplied damages or any other **Loss** defined above, the insurability of which is dependent on the law applicable to this Policy, the law of the jurisdiction most favorable to the insurability of such amounts will apply; provided that such jurisdiction is (i) where such amounts were awarded or imposed; (ii) where the **Wrongful Act, Enterprise Security Event** or violation of **Privacy Regulation** underlying the **Claim** took place; (iii) where either the Insurer or any **Insured** is incorporated, has its principal place of business, or resides; or (iv) where this Policy was issued or became effective.

**Loss**, however, does not include any of the following:

a.  amounts for which the **Insured** is legally or financially absolved from payment;

b.  fines or penalties imposed on the **Insured** except as otherwise set forth in items 2 through 4 above or in any **Coverage Part**;

c.  amounts, including but not limited to charges, commissions, compensation, costs, fees, or profits, that the **Insured** becomes liable to return or disgorge, including any sums representing such amounts or the return or disgorgement of such sums;

AXIS 101 0502 (10-16)

GTC Page 7 of 24



Exhibit A
PRIVATUS® PLATINUM

d.  amounts, other than **Defense Costs**, for which the **Insured** becomes liable pursuant to an order or agreement granting non-monetary or injunctive relief;

e.  amounts incurred to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants**;

f.  matters or amounts uninsurable under the law applicable to this Policy; and

g.  solely with respect to the MANAGEMENT AND ENTITY LIABILITY COVERAGE PART:

    (1)  amounts representing the increase in the consideration paid or proposed to be paid by the **Insured Entity** in connection with its purchase of any securities or assets or any amount representing such consideration; and

    (2)  solely under the **Insured Entity Liability Coverage**, amounts, other than **Defense Costs**, for which the **Insured Entity** becomes liable due to an actual or alleged breach of any contract, representation, warranty, guarantee or other agreement, unless the **Insured Entity** would be liable for such amounts in the absence of such contract, representation, warranty, guarantee or other agreement;

h.  solely with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART:

    (1)  future salary, wages, commissions, or **Employment Benefits** of any person who is hired, promoted, or reinstated to employment pursuant to an adjudication or settlement of any **Claim**;

    (2)  amounts, other than **Defense Costs**, for which the **Insured** becomes liable due to an actual or alleged breach of any written employment agreement or contract, unless the **Insured** would be liable for such amounts in the absence of such agreement or contract; or

    (3)  compensation earned by any person but not paid, including salary, wages, commissions, severance payments, and **Employment Benefits**;

i.  solely with respect to the FIDUCIARY LIABILITY COVERAGE PART, amounts, other than **Defense Costs**, for which the **Insured Entity** becomes liable due to an actual or alleged breach of any contract, representation, warranty, guarantee or other agreement, including any agreement to fund or make contributions to any **Plan**, unless the **Insured Entity** would be liable for such amounts in the absence of such contract, representation, warranty, guarantee, or agreement; and

j.  solely with respect to the PRIVASURE COVERAGE PART, royalties, return or offset of royalties, fees, deposits, commissions or charges or any award, calculation or determination of damages based on royalties, licensing fees or profits; any amounts attributable to loss of, theft of or the fluctuation in the value of, monies or securities; disgorgement of unjust enrichment or profits; or liquidated damages to the extent such liquidated damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement.

**Malicious Code** means any computer virus, Trojan horse, worm, or other code, script, or software program that is intentionally designed and released or inserted to access, damage, disable, or harm any part of a computer network or **Protected Data** on such network.

**Management Control** means the status of an entity during the time that the **Named Insured** directly or indirectly (i) owns more than 50% of the issued and outstanding voting equity securities of such entity; or (ii) controls voting rights representing the present right to elect or appoint more than 50% of the directors or trustees of such entity.

**Merchandise** means the **Insured Entity's** inventory, raw materials, work-in-progress, or products manufactured or distributed by the **Insured Entity**.

**Messenger** means any natural person duly authorized by the **Insured Entity** to have care and custody of property outside the **Premises**.

**Money** means currency, coins, or bank notes in current use and having a face value; or travelers' checks, register checks, or money orders held for sale to the public.

**Named Insured** means the entity designated as such in the DECLARATIONS.

AXIS 101 0502 (10-16)



Exhibit A
PRIVATUS® PLATINUM

**Outside Entity** means any non-profit entity.

**Outside Position** means the position of director, officer, trustee, or other equivalent executive position held by an **Insured Individual** in an **Outside Entity** if service in such position (i) takes place while such **Outside Entity** is not under **Management Control** and (ii) is with the express consent and knowledge of the **Insured Entity**.

**Owner** means any natural person who owns 25% or more of any corporation, has an ownership interest in any limited liability company, or is a partner of any partnership.

**Payment Card Industry Agreement** means rules adopted by a credit/debit card company, or credit/debit card processor delineating data security standards, data incident management protocols, or data incident indemnity obligations.

**Plan** means the **Sponsored Plans** and any government-mandated insurance program that provides workers' compensation, unemployment insurance, social security, or disability benefits for the **Insured Entity's** employees.

**Plan Violation Event** means any violation of **Employee Benefit Plan Law** that is eligible for correction under any **Voluntary Correction Program**.

**Policy Period** means the period designated as such in the DECLARATIONS, subject to earlier termination, as set forth in the Policy.

**Pollutant** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by any **Government Authority**, including but not limited to the United States Environmental Protection Agency. **Pollutant** also includes any other air or water emission, odor, waste water, oil or oil product, infectious or medical waste, asbestos or asbestos-containing material, lead or lead-containing material, noise, electric, magnetic, or electromagnetic field, fungi, mycotoxins, viruses, bacteria, or microbes or any other biological contaminant released into the atmosphere. **Pollutants** may take any form including, but not limited to, solids, liquids, gases, thermal or radiological irritants or contaminants, smoke, vapor, soot, fumes, acids, alkalis, silica, chemicals, or waste materials.

**Premises** means:

1. with respect to the CRIME COVERAGE PART:

   a. the interior portion of a building occupied by the **Insured Entity** to conduct the **Insured Entity's** business, except this does not apply to the **Theft of Client's Property Coverage**;

   b. with respect to the **Theft of Client's Property Coverage**, the interior portion of a building occupied by the **Client** to conduct the **Client's** business or occupied by a **Financial Institution** of the **Client**;

   c. solely with respect to the **Theft of Insured Entity's Coverage**, the interior portion of a building occupied by the **Financial Institution** of the **Insured Entity**; and

   d. solely with respect to a **Financial Institution**, the night depository chute or safe maintained by such **Financial Institution**; and

2. with respect to the WORKPLACE VIOLENCE COVERAGE PART, buildings, facilities, or property occupied by the **Insured Entity** in conducting its business.

**Privacy Regulation** means any of the following statutes and regulations associated with the care, custody, control, or use of personally identifiable financial, medical, or other sensitive personal information:

1. HIPAA;

2. the Health Information Technology for Economic and Clinical Health Act of 2009, and its related regulations;

3. the Gramm-Leach-Bliley Act of 1999;

4. the California Database Breach Act (SB1386);

AXIS 101 0502 (10-16)



5.   the Minnesota Plastic Card Security Act; or

6.   other identity theft and privacy protection statutes, rules and regulations similar to items 1 through 5 above that require commercial entities that collect, process, or store personal information (as defined in such statutes, rules and regulations, as applicable) to post privacy policies, adopt specific privacy controls, or to notify natural persons and/or organizations in the event that such personal information has been comprised or potentially compromised, or any **Similar Law**.

**Privacy Regulation Claim** means a civil proceeding, civil investigation, or request for information brought against any **Insured** for a violation of a **Privacy Regulation** resulting from a covered **Enterprise Security Event** and by or on behalf of any federal, state, local, or foreign governmental agency including the Federal Trade Commission or Federal Communications Commission; but **Privacy Regulation Claim** does not include an **Enterprise Security Event Claim**.

**Property** means tangible property that has intrinsic value but does not include **Information, Money, Premises,** or **Securities**.

**Property Damage** means physical injury to tangible property and any resulting loss or corruption of data or information, including all resulting loss of use of that property, data, or information. **Property Damage** does not mean the loss, corruption, or destruction of data or information when the tangible property on which the data or information resides or resided is not physically injured.

**Protected Data** means **Protected Personal Information** and **Corporate Information**.

**Protected Personal Information** means, with respect to natural persons, any private, non-public information of any kind in the **Insured Entity's** care, custody, or control, regardless of the nature or form of such information, including the following, but only if such information allows an individual to be uniquely identified:

1.   social security number;

2.   medical service or healthcare data;

3.   driver's license or state identification number;

4.   equivalents of any of the information listed in items 1 through 3 above;

5.   account, credit card, or debit card number, alone or in combination with any information that permits access to an individual's financial information, including, but not limited to, security or access code or password; or

6.   other non-public information to the extent prescribed under **Privacy Regulations**.

However, **Protected Personal Information** does not include **Corporate Information**, publicly available information that is lawfully in the public domain, or information available to the general public from government records.

**Public Relations Expense** means the reasonable costs of those services described below, incurred by or on behalf of an **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer, in response to an **Enterprise Security Event** that occurs or that the **Insured Entity** reasonably believes has occurred:

1.   hiring a public relations firm, law firm or crisis management firm for advertising or other communications services, including training a spokesperson, providing talking points for media interaction, developing frequently asked questions responses, drafting or editing press releases, preparing of internal memos and website content; or

2.   placing advertisements, preparing website content, and other communications as recommended by such public relations firm, law firm or a crisis management firm to explain the nature of the event and any corrective actions taken;

provided, however, **Public Relations Expense** does not mean and does not include **Crisis Management Expense, Fraud Response Expense** or **Forensic and Legal Expense**.

**Qualified Persons** means those natural living persons described below who are entitled to notification pursuant to item 1 in the definition of **Crisis Management Expense**, if such person elects to receive credit monitoring services or identity



monitoring services or **Identity Theft Insurance** within 180 days of receipt of such notification by the **Insured Entity**:

1. with respect to credit monitoring services and **Identity Theft Insurance**, a person whose social security number, driver's license number, government issued identification number, or financial account, credit card, or debit card number has been improperly accessed, lost, or stolen in addition to such person's name; and

2. with respect to identity monitoring services and **Identity Theft Insurance**, a person whose medical service or healthcare information has been improperly accessed, lost, or stolen in addition to such person's name.

**Regulatory Loss** means fines and penalties which the **Insured** becomes legally obligated to pay as a result of a **Privacy Regulation Claim** when permitted by applicable law. **Regulatory Loss** also includes sums paid to a **Consumer Redress Fund**.

**Related Claim** means all **Claims** arising out of a single **Wrongful Act, Enterprise Security Event**, or violation of a **Privacy Regulation** or **Related Wrongful Acts, Related Enterprise Security Events**, or **Related Violations**.

**Related Enterprise Security Event** means all **Enterprise Security Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Event** means all **Securityholder Derivative Events, Plan Violation Events, Enterprise Security Events, Workplace Violence Events, Stalking Events**, or other covered **Events** arising out of a single **Securityholder Derivative Event, Plan Violation Event, Enterprise Security Event, Workplace Violence Event, Stalking Event**, or other covered **Event** or **Related Securityholder Derivative Events, Related Violations, Related Enterprise Security Events, Related Workplace Violence Events, Related Stalking Events**, or other related covered Events.

**Related Extortion Threat** means all **Extortion Threats** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Securityholder Derivative Event** means all **Securityholder Derivative Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Stalking Event** means all **Stalking Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Violation** means all **Plan Violation Events** or violations of **Privacy Regulations** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Workplace Violence Event** means all **Workplace Violence Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Wrongful Act** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Restoration Expense** means the actual an necessary costs incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer to recover or restore **Information** from the **Insured Entity's** analysis files, specifications, or backups of **Electronic Data** that are located in the **Premises**; but **Restoration Expense** does not include costs to:

1. recover or reconstruct restore Information if the Insured Entity knowingly uses illegal copies of programs;

2. design, create, research, or develop **Information**, including without limitation software and trade secrets;



3. update, upgrade, or enhance **Information**; or

4. replace any computer system, or to identify or remove software program errors, malware, computer viruses or vulnerabilities.

**Retroactive Date** means the applicable date designated as such in the DECLARATIONS for any **Claims-Made Liability Coverage**.

**Robbery** means the unlawful taking of property from a **Custodian** by a person who caused or threatened to cause physical harm to the **Custodian** or committed an obviously unlawful act witnessed by the **Custodian**.

**Safe Burglary** means the unlawful taking of property from a locked vault or safe by forcible or violent entry into, evidenced by visible marks on, such vault or safe.

**Securities** means negotiable and non-negotiable instruments or contracts representing either **Money** or **Property**, including tokens, tickets, or stamps (whether represented by actual stamps or unused value in a meter) in current use, or evidences of debt issued in connection with credit or charge cards that are not issued by the **Insured**; but **Securities** does not include **Money** or any registered or coupon obligations.

**Securityholder Derivative Event** means:

1. a written demand by one or more securityholders of the **Insured Entity**:

   a. pursuant to Section 220 of the Delaware General Corporation Law or any similar statute in any other jurisdiction, to inspect the **Insured Entity's** books and records in connection with a justiciable **Wrongful Act** by an **Insured Individual**; or

   b. upon the board of directors or equivalent governing body of the **Insured Entity** to bring a civil proceeding in a court of law against one or more **Insured Individuals** for a **Wrongful Act**; or

2. a lawsuit by a securityholder of the **Insured Entity** brought derivatively on behalf of the **Insured Entity** against any **Insured Individual** for a **Wrongful Act** without first making a demand as described in item b above.

**Securityholder Derivative Event Expense** means reasonable costs incurred by **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer to investigate or evaluate a **Securityholder Derivative Event** or seek a dismissal thereof in the **Insured Entity's** capacity as a nominal defendant.

**Service Contractor** means any organization to which the **Insured Entity** has given care, custody, or control of, or access to, **Protected Personal Information** pursuant to a written contract or agreement with the **Insured Entity**, but only while acting within the scope of its duties performed on behalf of the **Insured Entity**.

**Similar Law** means any amendment to or rule, regulation, or order promulgated under such law or any similar federal, state, local, or foreign common law or statutory law, or any amendment to or rule, regulation, or order promulgated thereunder that regulates or governs the same subject.

**Sponsored Plan** means, individually and collectively, any employee welfare, pension, or benefit plan established anywhere in the world that is sponsored solely by the **Named Insured** or any **Subsidiary** or jointly by the **Named Insured** or any **Subsidiary** and a labor organization solely for the benefit of the employees of the **Named Insured** or such **Subsidiary**; but **Sponsored Plan** does not include any multiemployer plan or employee stock ownership plan.

**Stalking Event** means repeated, verifiable, and credible acts of following or harassing and threatening to cause physical harm to an **Insured Individual** by another person.

**Stalking Expense** means reasonable costs incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer to retain one or more independent consultants to provide threat assessment or threat management services to the **Insured** for up to 90 days after a **Stalking Event** occurs.



Exhibit A
PRIVATUS® PLATINUM

**Subsidiary** means:

1. with respect to all **Coverage Parts** other than the CRIME COVERAGE PART, any entity that is or was under **Management Control**; or

2. with respect to the CRIME COVERAGE PART, any entity that is under **Management Control**.

**System Investigation** means an investigation of the **Computer System** to determine the cause of an **Enterprise Security Event** that occurred or that the **Insured Entity** reasonably believes has occurred, and to identify and enroll or catalog the persons' names, addresses, and **Protected Personal Information** that may have been improperly, accessed, lost, or stolen for the purposes of providing notification that may be required.

**Theft** means the unlawful taking of property to the deprivation of the **Insured Entity** or, with respect to the **Theft of Client's Property Coverage** in the CRIME COVERAGE PART, to the deprivation of a **Client**. For purposes of the **Employee Theft Coverages** in the CRIME COVERAGE PART, **Theft** includes **Forgery**.

**Training Expense** means reasonable costs incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written consent of the Insurer to provide workplace educational, sensitivity, or diversity training or protected class development programs required by any judgment or settlement of a **Claim**.

**Transfer Account** means:

1. an account maintained by an **Insured Entity** at a **Financial Institution** from which the **Insured Entity** can initiate the transfer, payment, or delivery of **Money** or **Securities**, except this does not apply to the **Theft of Client's Property Coverage** in the CRIME COVERAGE PART; or

2. solely with respect to the **Theft of Client's Property Coverage** in the CRIME COVERAGE PART, an account maintained by a **Client** at a **Financial Institution** from which the **Client** can initiate the transfer, payment, or delivery of **Money** or **Securities**.

**Transfer Instruction** means:

1. a telephone, written, or electronic instruction from a **Client, Employee,** or **Vendor** to transfer, pay, or deliver **Money** or **Securities** from the **Premises** or a **Transfer Account**, except this does not apply to the **Funds Transfer Fraud Coverage** in the CRIME COVERAGE PART; or

2. solely with respect to the **Funds Transfer Fraud Coverage** in the CRIME COVERAGE PART, only an instruction (other than a covered instrument) from the **Insured Entity** directing a **Financial Institution** to pay, transfer, or deliver **Money** or **Securities** from a **Transfer Account**.

**Vendor** means any person or entity (other than a **Financial Institution** or armored motor vehicle company) that provides goods or services to the **Insured Entity** pursuant to a written contract.

**Voluntary Correction Expense** means:

1. attorney and expert fees and costs incurred by or on behalf of the **Insured** in excess of the **Insured's** normal operating costs and with the prior written approval of the Insurer in connection with a **Plan Violation Event**; and

2. application costs, fines, penalties, or taxes assessed against or imposed on the **Insured** in connection with a **Voluntary Correction Program**;

but **Voluntary Correction Expense** does not include amounts to correct a **Plan Violation Event** or amounts incurred in connection with any audit of any **Plan**.

**Voluntary Correction Program** means the Delinquent Filer Voluntary Compliance Program or and the Voluntary Fiduciary Correction Program administered by the EBSA or the Employee Plans Compliance Resolution System administered by the IRS, or any similar voluntary correction program available under any **Employee Benefit Plan Law** to correct a **Plan Violation Event**.

AXIS 101 0502 (10-16)



**Exhibit A**
PRIVATUS® PLATINUM

**Wage & Hour Law** means any law regulating or governing payroll practices and policies, the payment of wages, or recordkeeping or labor standards affecting employees, including the Fair Labor Standards Act, or any **Similar Law**; provided that solely with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, **Wage & Hour Law** does not include the Equal Pay Act.

**Workplace Violence Event** means an intentional and unlawful act in or on the **Premises** involving the use or threat of use of a deadly weapon that caused or could have caused the death of any natural person.

**Workplace Violence Expense** means:

1. reasonable costs incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer to retain one or more independent consultants to provide workplace violence recovery, security, or prevention-related services to the **Insured Entity** for up to 90 days after a **Workplace Violence Event**; and

2. the Death Benefit stated in the DECLARATIONS for the death of any **Insured Individual** taking place within 90 days after a **Workplace Violence Event**.

**Wrongful Act** means:

1. with respect to the MANAGEMENT AND ENTITY LIABILITY COVERAGE PART:

    a. any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by:

    (1) an **Insured Individual** in his or her capacity as such or in an **Outside Position**; or

    (2) the **Insured Entity**, with respect to the **Insured Entity Liability Coverage**; or

    b. any matter claimed against an **Insured Individual** solely by reason of his or her status as such or in an **Outside Position**;

2. with respect to the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART, only a **Wrongful Employment Act** or **Wrongful Third Party Act**; or

3. with respect to the FIDUCIARY LIABILITY COVERAGE PART:

    a. any actual or alleged violation by the **Insured** of any of the responsibilities, obligations, or duties imposed by any **Employee Benefit Plan Law** on fiduciaries of any **Sponsored Plan**;

    b. any actual or alleged negligent act, error, or omission by the **Insured** in the **Administration** of any **Plan**; or

    c. any matter claimed against an **Insured** by reason of such **Insured's** status as a fiduciary of any **Sponsored Plan**.

**Wrongful Employment Act** means any actual or alleged:

1. discrimination or sexual or other harassment, including bullying, in the workplace in violation of any law that prohibits such conduct, or any **Similar Law**, or based on gender identity or expression or sexual orientation;

2. wrongful demotion, discharge, dismissal, termination (either actual or constructive), or adverse change in the terms, conditions or status of employment;

3. wrongful failure to employ, promote, or grant tenure;

4. wrongful discipline, evaluation, deprivation of a career opportunity, or negative reference;

5. employment-related misrepresentation;

6. employment-related defamation, libel, or slander;

AXIS 101 0502 (10-16)



Exhibit A
PRIVATUS® PLATINUM

7. employment-related invasion of privacy, including the unauthorized use or disclosure of an **Employee's** (i) medical information in violation of HIPAA or any **Similar Law**; (ii) credit information in violation of the Fair Credit Reporting Act or any **Similar Law**; or (iii) other information obtained through a background check;

8. breach of any oral, written, or implied employment contract;

9. retaliation in employment for exercising any legally protected right or engaging in any legally protected activity; or

10. failure to adopt adequate employment-related policies and procedures; negligent hiring, training, supervision, or retention of employees; false arrest, detention, or imprisonment; malicious prosecution; or wrongful infliction of emotional distress, mental anguish, or humiliation; but only when alleged in connection with items 1 through 9 above;

committed by an **Insured** against an **Employee** by any means, including via the internet by postings to social media sites, whether or not such internet activity is during or after work hours or on or off the work premises.

**Wrongful Third Party Act** means any actual or alleged discrimination or harassment, whether sexual or otherwise, in violation of a person's civil rights, committed by an **Insured** against any person other than an **Employee**.

## EXCLUSIONS

### Exclusions Applicable to All Claims-Made Liability Coverages

The **Claims-Made Liability Coverages** do not apply to **Claims**:

### Cyber

based upon or arising out of any actual or alleged **Cyber Attack** or release, disclosure, theft, or loss of or the failure to prevent the release, disclosure, theft, or loss of, confidential information or non-public personal information; except this exclusion does not apply to the PRIVASURE COVERAGE PART.

### Violation of Consumer Protection Law

based upon or arising out of any actual or alleged violation of any law that regulates or governs commercial solicitation or messaging or automatic contract renewals, including but not limited to the Telephone Consumer Protection Act, Canadian Radio-Television and Telecommunications Act, CAN-SPAM Act of 2003, Canadian Anti-Spam Law of 2010, California Automatic Renewal Law, or any **Similar Law**; except this exclusion does not apply to a **Privacy Regulation Claim** covered under the PRIVASURE COVERAGE PART.

### Violation of Employment Benefit Plan Law

based upon or arising out of any actual or alleged violation of any **Employee Benefit Plan Law**; except this exclusion does not apply to any **Claim**:

1. for retaliation covered under the **Employment Practices Liability Coverage** in the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART; or

2. covered under the FIDUCIARY LIABILITY COVERAGE PART.

### Violation of Wage & Hour Law

based upon or arising out of any actual or alleged violation of **Wage & Hour Law**; except this exclusion does not apply to any **Claim** for retaliation covered under the **Employment Practices Liability Coverage** in the EMPLOYMENT PRACTICES LIABILITY COVERAGE PART.



**Exhibit A**
**PRIVATUS® PLATINUM**

---

**LIMITS OF INSURANCE, RETENTIONS, AND REIMBURSEMENT**

A. **Limits of Insurance**

1. **Crime Coverage Part**

   The Limits of Insurance for each loss for each Coverage in the CRIME COVERAGE PART is the most the Insurer will pay for each loss under such Coverage or, with respect to the **Investigation Expense Coverage**, for all covered expenses in connection with each covered loss under any other Coverage. If a single loss is covered under more than one Coverage, the Limit of Insurance that applies to such loss will not exceed the highest Limit of Insurance for each loss that applies.

2. **All Coverage Parts Except the Crime Coverage Part**

   The Limits of Insurance for all **Coverage Parts** other than the CRIME COVERAGE PART will not exceed the amounts stated respectively in the DECLARATIONS no matter how many **Insureds** are covered; **Claims** are made against the **Insureds**; or **Wrongful Acts, Securityholder Derivative Demand Events, Plan Violation Events, Enterprise Security Events**, violations of **Privacy Regulations, Extortion Threats, Workplace Violence Events, Stalking Events** or other covered **Events** occur.

   a. **Policy Limit of Insurance**

      The Policy Limit of Insurance stated in the DECLARATIONS ("Policy Limit") is the most the Insurer will pay under this Policy for all applicable **Coverage Parts**.

   b. **Aggregate Limits of Insurance**

      Subject to the Policy Limit, any Aggregate Limit of Insurance stated in the DECLARATIONS ("Aggregate Limit") is the most the Insurer will pay under all applicable **Coverage Parts, Claims-Made Liability Coverages**, or **First-Party Coverages** that are subject to such Aggregate Limit.

   c. **Coverage Part Limits of Insurance**

      Subject to the Policy Limit and any applicable Aggregate Limit, any Coverage Part Limit of Insurance ("Coverage Part Limit") stated in the DECLARATIONS is the most the Insurer will pay under each respective **Coverage Part**.

   d. **Coverage Limits of Insurance**

      Subject to the Policy Limit and any applicable Aggregate Limit and Coverage Part Limit, each Coverage Limit stated in the DECLARATIONS is the most the Insurer will pay under each respective **Claims-Made Liability Coverage, Expense Coverage**, or **First-Party Coverage**.

      (1) If multiple **Claims-Made Liability Coverages** apply to the same **Claim**, the Limit of Insurance that applies to such **Claim** will not exceed the highest Limit of Insurance available under any one **Claims-Made Liability Coverage** that applies.

      (2) **Defense Costs** are part of, and not in addition to, the **Claims-Made Liability Coverage** Limits of Insurance and payment of **Defense Costs** by the **Insurer** reduces and may totally exhaust such Limits of Insurance.

      (3) No **Extended Reporting Period** reinstates or increases the **Claims-Made Liability Coverage** Limits of Insurance.

   e. **Sublimits of Insurance**

      Each Sublimit of Insurance, if any, stated in the DECLARATIONS ("Sublimit") is the most the Insurer will pay for all **Loss** or other covered amounts that are subject to such Sublimit. All Sublimits are part of, and not in



addition to, all other applicable Limits of Insurance.

**B. Retentions and Coinsurance**

If a Retention or Coinsurance is stated in the DECLARATIONS, the **Insureds** are responsible for payment of such Retention or Coinsurance, which will be borne by the **Insureds** uninsured and at their own risk. The Insurer's obligation to pay under this Policy is excess of the applicable Retention and Coinsurance. The Limits of Insurance will not be reduced by payment of any Retention or Coinsurance.

If multiple Coverages apply to a single **Claim**, loss, or other event, the Retention that applies to such **Claim**, loss, or other event will not exceed the highest Retention that applies to such **Claim** or loss.

No Retention applies to **Loss** that the **Insured Individual** is legally obligated to pay if such **Loss** is not indemnified by the **Insured Entity** because the **Insured Entity** either is not legally permitted to provide such indemnification or is unable to provide such indemnification by reason of **Financial Impairment**.

**C. Reimbursement**

If the Insurer pays amounts in excess of any applicable Limit of Insurance, in excess of the Insurer's obligation to pay pursuant to the **DEFENSE AND SETTLEMENT OF CLAIMS** section, or in connection with any **Claim** for which this Policy does not afford coverage, or if the Insurer has paid part or all of the Retention, the Insurer will have the right to seek recovery from the **Insureds** for any such amounts.

## DEFENSE AND SETTLEMENT OF CLAIMS

Except as otherwise set forth below, the **Insureds** will not settle or offer to settle any **Claim**, pay any **Loss**, incur any **Defense Costs**, admit or assume any liability, stipulate to any judgment or award, or otherwise assume any contractual obligation with respect to a **Claim**, without the Insurer's prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, if all applicable **Insureds** are able to fully and finally dispose with prejudice such **Claim** for an amount, including **Defense Costs**, within the remaining applicable Retention, then the Insurer's consent will not be required for such disposition.

**A. Insurer's Duty to Defend**

Except as otherwise set forth in this Policy, the Insurer will have the right and duty to defend any covered **Claim** even if the allegations are groundless, false, or fraudulent. The Insurer's right and duty to defend any **Claim** ends when the applicable Limit of Insurance has been exhausted.

The Insurer will have the right to appoint legal counsel on the **Insured's** behalf and to investigate and settle a covered **Claim** as the Insurer deems necessary, provided the Insurer will not settle a **Claim** without the **Insured's** consent, which shall not be unreasonably withheld.

**B. Insured's Duty to Defend**

If any single **Claim** alleging a covered **Wrongful Act** also alleges that the **Insured** has violated any **Wage & Hour Law**, then it shall be the duty of the **Insured**, and not the Insurer, to defend such **Claim**.

The **Insured** shall appoint defense counsel from the Insurer's then current list of approved defense firms in the jurisdiction in which the **Claim** is made, and such defense counsel shall comply with the Insurer's Litigation Management Guidelines.

The Insurer will have the right and will be given the opportunity to effectively associate with the **Insured** in the investigation, defense, and settlement of the **Claim**.

If the **Insured** incurs **Loss** jointly with others who are not covered for such **Claim**, the **Insured** and the Insurer agree to use their best efforts to determine a fair and reasonable allocation of **Loss** to the **Insureds** that are covered for such **Claim**. The **Insured** and the Insurer also agree to use their best efforts to determine a fair and reasonable allocation of covered **Loss** incurred for such **Claim** and amounts incurred in connection with the allegation of the



violation of **Wage & Hour Law** and any other uncovered matter in such **Claim**. In all events, the **Insured** and the Insurer agree to take into account the relative legal and financial exposures of the parties in making such determination.

If the **Insured** and the Insurer cannot agree on an allocation of **Defense Costs**, the Insurer will pay, on a current basis, **Defense Costs** that the Insurer believes to be covered until a different allocation is negotiated, arbitrated, or judicially determined. Any such allocation will be applied retroactively to all **Defense Costs** on account of such **Claim**, but will not apply to or create any presumption with respect to the allocation of other amounts arising from such **Claim** or any other **Claim**.

## REPORTING OF CLAIMS AND EVENTS

A. **When a Claim is Made or an Event Occurs**

1. With respect to any **Claims-Made Liability Coverage**, a **Claim** will be deemed to be first made on the earlier of:

   a. the date of any **Insured Executive's** receipt of notice of such demand, request, notice, investigation, or letter if such **Claim** is a written demand, request for information, notice of charges or violation, notice of investigation, target letter, or fact-finding investigation; or

   b. the date of service upon or other receipt by any **Insured Executive** of a complaint, pleading, appeal, indictment, information, or warrant in any such proceeding, if such **Claim** is a civil proceeding, criminal proceeding, arbitration, or alternative dispute resolution proceeding.

   If **Related Claims** are subsequently made against the **Insured** and are reported to the Insurer, all such **Related Claims**, whenever made, will be considered a single **Claim** and such **Claim** will be deemed to have been made on the date the first of those **Claims** was made against any **Insured**.

2. With respect to the **Expense Coverages** in the MANAGEMENT AND ENTITY LIABILITY COVERAGE PART, a **Securityholder Derivative Event** or other covered **Event** will be deemed to occur when the **Securityholder Derivative Event** or other covered **Event** becomes known to any **Insured Executive**.

   If **Related Events** subsequently occur and are reported to the Insurer, all such **Related Events**, whenever occurring, will be considered a single **Securityholder Derivative Event** or other covered **Event** and such **Securityholder Derivative Event** or other covered **Event** will be deemed to have occurred on the date the first of those **Securityholder Derivative Events** or other covered **Events** occurred.

3. With respect to the **Expense Coverages** in the FIDUCIARY LIABILITY COVERAGE PART, a **Plan Violation Event** or other covered **Event** will be deemed to occur when the **Plan Violation Event** or other covered **Event** becomes known to any **Insured Executive**.

   If **Related Events** subsequently occur and are reported to the Insurer, all such **Related Events**, whenever occurring, will be considered a single **Plan Violation Event** or other covered **Event** and such **Plan Violation Event** or other covered **Event** will be deemed to have occurred on the date the first of those **Plan Violation Events** or other covered **Events** occurred.

4. With respect to the **First-Party Coverages** in the PRIVASURE COVERAGE PART, an **Enterprise Security Event**, **Extortion Threat**, or other covered **Event** will be deemed to occur when the **Enterprise Security Event**, **Extortion Threat**, or other covered **Event** becomes known to any **Insured Executive**.

   If **Related Events** subsequently occur and are reported to the Insurer, all such **Related Events**, whenever occurring, will be considered a single **Enterprise Security Event**, **Extortion Threat**, or other covered **Event** and such **Enterprise Security Event**, **Extortion Threat**, or other covered **Event** will be deemed to have occurred on the date the first of those **Enterprise Security Events**, **Extortion Threats**, or other covered **Events** occurred.



5. With respect to the WORKPLACE VIOLENCE COVERAGE PART, a **Workplace Violence Event** or **Stalking Event** will be deemed to occur when the **Workplace Violence Event** or **Stalking Event** becomes known to any **Insured Executive**.

If **Related Events** subsequently occur and are reported to the Insurer, all such **Related Events**, whenever occurring, will be considered a single **Workplace Violence Event** or **Stalking Event** and such **Workplace Violence Event** or **Stalking Event** will be deemed to have occurred on the date the first of those **Workplace Violence Events** or **Stalking Events** occurred.

**B. Reporting of Claims, Events, and Loss**

It is a condition precedent to coverage under:

1. all **Claims-Made Liability Coverages**, that as soon as practicable after any **Insured Executive** becomes aware of any **Claim**, the **Insured** must notify the Insurer thereof in writing, but in no event later than 90 days after the end of the **Policy Period** or, with respect to a **Claim** made during the **Extended Reporting Period**, if applicable, no later than the expiration thereof.

2. the **Expense Coverages** in the MANAGEMENT AND ENTITY LIABILITY COVERAGE PART, that as soon as practicable after any **Insured Executive** becomes aware of any **Securityholder Derivative Event** or other covered **Event**, the **Insured** must notify the Insurer thereof in writing, but in no event later than 90 days after the end of the **Policy Period**.

3. the **Expense Coverages** in the FIDUCIARY LIABILITY COVERAGE PART, that as soon as practicable after any **Insured Executive** becomes aware of any **Plan Violation Event** or other covered **Event**, the **Insured** must notify the Insurer in writing thereof, but in no event later than 90 days after the end of the **Policy Period**. This notice must contain known details concerning the violation and any proposed correction.

4. the **First-Party Coverages** in the PRIVASURE COVERAGE PART and under the WORKPLACE VIOLENCE COVERAGE PART, that as soon practicable after any **Insured Executive** becomes aware of any **Enterprise Security Event**, **Extortion Threat**, **Workplace Violence Event**, **Stalking Event**, or other covered **Event**, the **Insured** must immediately notify the Insurer thereof in writing, but in no event later than 30 days after such **Enterprise Security Event**, **Extortion Threat**, **Workplace Violence Event**, **Stalking Event**, or other covered **Event** first occurs. Such notice must contain known details concerning the person or entity making or responsible for the **Enterprise Security Event**, **Extortion Threat**, **Workplace Violence Event**, **Stalking Event**, or other covered **Event** and all reasonably obtainable information concerning the time, place, and other details thereof.

5. the **CRIME COVERAGE PART**, that:

   a. within 90 days after **Discovery** or before the end of the **Policy Period**, whichever is earlier, the **Named Insured** must notify the Insurer in writing of loss or an occurrence that could lead to covered loss; and

   b. at the earliest practicable moment, but in no event later than 6 months after **Discovery**, the **Named Insured** must furnish a proof of loss with full particulars to the Insurer. Proof of loss must include either the original or a certified copy of any instrument or instruction involved in the loss.

**C. Reporting of Circumstances under Claims-Made Liability Coverages**

If during the **Policy Period** or the **Extended Reporting Period**, if applicable, an **Insured** gives the Insurer written notice of any **Wrongful Act**, **Enterprise Security Event**, violation of a **Privacy Violation**, act, error, omission, fact or circumstance that occurred before the end of the **Policy Period** and is reasonably likely to give rise to a **Claim** with full details of:

1. such **Wrongful Act**, **Enterprise Security Event**, violation of a **Privacy Violation**, other covered **Event**, act, error, omission, fact or circumstance including any available information on persons or entities involved;

2. the nature and extent of the potential damages and the names of the potential claimants; and



**Exhibit A**
**PRIVATUS® PLATINUM**

3.  the manner in which the **Insured** first became aware of such **Wrongful Act, Enterprise Security Event**, violation of a **Privacy Violation**, other covered **Event**, act, error, omission, fact or circumstance;

then any such **Claim** subsequently arising out of such **Wrongful Act, Enterprise Security Event**, violation of a **Privacy Violation**, other covered **Event**, act, error, omission, fact or circumstance will be deemed to have been made during the policy period in which such notice was given. In order for coverage to apply to any such **Claim**, the **Insured** must provide notice to the Insurer of such **Claim** in accordance with paragraph B above. No coverage will be provided for any **Defense Costs** incurred prior to the time such **Claim** is made unless otherwise authorized in writing by the Insurer.

---

## EXTENDED REPORTING PERIODS

No **Extended Reporting Period** will be construed to be a new policy and any **Claim** submitted during an **Extended Reporting Period** will be subject to the Policy's terms and conditions, except as specifically set forth below. All **Claims** made during an **Extended Reporting Period** must be reported in accordance with the **REPORTING OF CLAIMS AND EVENTS** section.

A.  **Automatic Extended Reporting Period**

If the **Named Insured** cancels or nonrenews this Policy or the Insurer nonrenews this Policy, the **Insureds** will have an automatic, non-cancelable 90-day **Extended Reporting Period**. This automatic **Extended Reporting Period** is not available if the **Named Insured** elects an optional **Extended Reporting Period**, or if the **Named Insured** obtains another insurance policy that applies to such **Claim** within such 90 day period.

B.  **Optional Extended Reporting Period**

If the **Named Insured** cancels or nonrenews this Policy or the Insurer nonrenews this Policy, the **Named Insured** will have the right to purchase an optional **Extended Reporting Period** to immediately follow the effective date of cancellation or nonrenewal.

The optional **Extended Reporting Periods** and their respective additional premiums are stated in the DECLARATIONS. The Insurer must receive written notice of the optional **Extended Reporting Period** elected together with payment of the applicable additional premium, within 60 days after the end of the **Policy Period**. If the Insurer does not receive payment within such period, the Insurer will not be required to provide any optional **Extended Reporting Period**. Premium for the optional **Extended Reporting Period** will be fully earned on the effective date thereof. Once in effect, the optional **Extended Reporting Period** may not be canceled.

C.  A **Claim** reported in writing to the Insurer during the **Extended Reporting Period** will be deemed to have been made on the last day of this **Policy Period**.

D.  No **Extended Reporting Period** reinstates or increases the Limits of Insurance.

---

## CONDITIONS

**Action Against the Insurer**

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy by all **Insureds**, nor until the amount of the **Insured's** obligation to pay has been fully determined either by judgment or award against the **Insured** after trial or arbitration or by written agreement among the **Insureds**, the claimant and the Insurer.

Solely with respect to the CRIME COVERAGE PART no action may be taken against the Insurer earlier than 90 days after proof of loss has been furnished or later than two years after **Discovery**.

No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **Insured** to determine the **Insured's** liability, nor will the Insurer be impleaded by the **Insured** or the **Insured's** legal representative.



**Advancement**

The Insurer, at its sole discretion, may pay any **Loss** within the applicable Retention, and in such event, the **Insureds** shall have a direct and immediate obligation to reimburse the Insurer for all such payments up to the applicable Retention.

**Assignment**

Assignment of any right or interest under this Policy will not bind the Insurer unless and until the Insurer's written consent is endorsed hereon.

**Assistance and Cooperation**

All **Insureds** will cooperate with the Insurer in the handling of any **Claim** or other matter for which the **Insureds** seek coverage under this Policy and upon the Insurer's request will:

1. furnish the Insurer with copies of demands, reports, investigations, pleadings and all related papers and such other information;

2. attend hearings, depositions, conferences, and trials;

3. assist in effecting settlements, securing and giving evidence, and obtaining the attendance of witnesses and assist and cooperate in any other aspect of the investigation and defense as the Insurer may reasonably request; and

4. with respect to the CRIME COVERAGE PART and the **First-Party Coverages** in the PRIVASURE COVERAGE PART, fully cooperate with the Insurer in all matters pertaining to a loss or claim, including submitting to examination under oath at the Insurer's request; assisting in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured Entity**; and authorizing and assisting the Insurer in obtaining, accessing and inspecting records, property or any other relevant information.

An **Insured** will do nothing that in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery. No **Insured** will, except at the **Insured's** own cost, voluntarily make a payment, admit liability, assume any obligation or incur any expense without the Insurer's prior written consent unless otherwise specifically permitted.

The failure of the **Insured Entity** or an **Insured Individual** to comply with this condition will not be imputed to another **Insured Individual**, and only the failure of any **Insured Executive** to comply with this condition will be imputed to the **Insured Entity**.

**Authorization of Named Insured**

The **Named Insured** is responsible for payment of all premiums and retentions. The **Named Insured** has exclusive authority to act on behalf of all other **Insureds** with respect to providing and receiving notices of cancellation or nonrenewal, receiving any return premium, and purchasing any optional **Extended Reporting Period**. In the event of a disagreement between any **Insureds**, the **Named Insured** will have exclusive authority to act on behalf of all other **Insureds** with respect to negotiation of settlements and the decision to appeal or not to appeal any judgment.

**Bankruptcy**

The bankruptcy or insolvency of any **Insured** or of any **Insured Individual's** estate will not relieve the Insurer of the Insurer's obligation under this insurance. In the event of bankruptcy or insolvency of an **Insured Entity**, the **Insureds** shall waive and release any automatic stay or injunction in such proceeding that may apply to this Policy or its proceeds, and agree not to oppose or object to any efforts by the Insurer or any **Insured** to obtain relief from any such stay or injunction.



**Exhibit A**
**PRIVATUS® PLATINUM**

**Cancellation and Nonrenewal**

1.  **Cancellation**

    a.  The **Named Insured** may cancel this Policy by mailing or delivering written notice of cancellation to the Insurer at its address stated in the DECLARATIONS. Such notice will state the effective date of cancellation or, if no effective date is stated, the effective date of cancellation will be 10 days after the Insurer's receipt of notice. The **Policy Period** will end on that date.

    b.  The Insurer may cancel this Policy only for non-payment of premium. In such event, the Insurer will mail or deliver written notice of cancellation for non-payment of premium to the **Named Insured** at its address stated in the DECLARATIONS, at least 20 days before the effective date of cancellation.

    c.  If this Policy is canceled, the Insurer will return to the **Named Insured** any unearned premium, calculated pro rata, but the return of premium to the **Named Insured** is not a condition precedent to cancellation.

2.  **Nonrenewal**

    The Insurer may elect not to renew this policy by mailing or delivering written notice of nonrenewal to the **Named Insured** at its address stated in the DECLARATIONS, at least 60 days before the end of the **Policy Period**. If notice of nonrenewal is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**Change in Control**

If during the **Policy Period**:

1.  the **Named Insured** completes an initial public offering of securities registered with the Securities and Exchange Commission or merges or consolidates with another entity such that the **Named Insured** is not the surviving entity; or

2.  any person, entity, or group of persons or entities acting in concert acquires:

    a.  majority voting control of or the right to elect, appoint, or designate at least 50% of the directors or equivalent executives of the **Named Insured**;

    b.  securities which result in such person, entity or group owning more than 50% of the issued and outstanding voting securities of the **Named Insured**; or

    c.  all or substantially all of the assets of the **Named Insured**;

("Change in Control") coverage under this Policy will apply as follows:

a.  Coverage will continue under the CRIME COVERAGE PART to the end of the **Policy Period**.

b.  Coverage will continue under the **Claims-Made Liability Coverages** to the end of the **Policy Period**, but only with respect to **Wrongful Acts, Enterprise Security Events**, violations of **Privacy Regulations**, or other covered Events that occurred prior to the effective date of the Change in Control.

c.  Coverage will cease under the **Expense Coverages** and **First-Party Coverages** and under the WORKPLACE VIOLENCE COVERAGE PART as of the effective date of the Change in Control with respect to **Securityholder Derivative Events, Plan Violation Events, Enterprise Security Events, Extortion Threats, Workplace Violence Events, Stalking Events**, or other covered Events first occurring after the effective date of the Change in Control.

The **Financial Impairment** of the **Named Insured** will not be deemed a Change in Control under this condition.



**Exhibit A**
**PRIVATUS® PLATINUM**

**Changes to the Policy**

Notice or knowledge possessed by any person will not effect a waiver or a change in any part of this Policy or estop the Insurer from asserting any rights under the terms of this Policy, nor will the terms of this Policy be waived or changed except by written endorsement issued to form a part of this Policy.

**Legal Representatives, Spouses, or Domestic Partners**

The legal representatives, estate, heirs, spouse or domestic partner of any **Insured Individual** will be considered to be an **Insured** under this policy, but only for a **Claim** against such person arising solely out of their status as such and, with respect to a spouse or domestic partner, only where such **Claim** seeks amounts from marital community, jointly held property or property transferred from such insured to such spouse or domestic partner. No coverage is provided for any act, error, or omission committed by any legal representative, estate, heir, spouse, or domestic partner. The term "domestic partner" as used in this condition means any natural person recognized by law or by the **Insured Entity** as a domestic partner or partner in a civil union.

**New and Former Entities**

1. If during the **Policy Period**, the **Named Insured** obtains **Management Control** of any entity, then this Policy will provide coverage for:

   a. such entity and its subsidiaries, directors, officers, trustees, and employees who would otherwise become **Insureds** pursuant to the provisions of this Policy; provided that the effective date of **Management Control** will be deemed to be the **First Inception Date** with respect to such coverage; and

   b. loss **Discovered** on or after the date such new entity became an **Insured Entity**.

2. If before or during the **Policy Period** an **Insured Entity** other than the **Named Insured** ceases to be an **Insured Entity**, the **Claims-Made Liability Coverage** afforded by this Policy will continue to the end of the **Policy Period** with respect to such former **Insured Entity** and its subsidiaries, directors, officers, trustees, and employees who were **Insureds** pursuant to the provisions of this Policy, but only for **Wrongful Acts, Enterprise Security Events**, or violations of **Privacy Regulations** occurring before the date such entity ceased to be an **Insured Entity**. Under the FIDUCIARY LIABILITY COVERAGE PART, a **Sponsored Plan** will be deemed to have ceased being an **Insured Entity** on the final date the assets of such **Sponsored Plan** are distributed.

3. Under the CRIME COVERAGE PART, coverage ceases with respect to any entity for loss **Discovered** after the date the entity ceases to be an **Insured Entity**.

**Notices**

Except as otherwise provided in this Policy, all notices under this Policy must be in writing and delivered by prepaid express courier or certified mail, facsimile, or electronic mail to the appropriate party at the street address, fax number, or email address, as applicable, designated in the DECLARATIONS. Notices to the **Insureds** will be given to the **Named Insured**. Notice will be deemed to be received and effective upon actual receipt by the addressee or one day following the date such notice is sent, whichever is earlier.

**Other Insurance**

If there is any other valid and collectible insurance available to the **Insured** that applies to **Loss** covered under this Policy, this insurance shall be excess over such other insurance, except when the other insurance is specifically written excess of this Policy.

**Payments**

The Insurer will be entitled to pay **Loss** and other covered amounts as they become due and payable under this Policy without consideration of other future payment obligations. However, if **Loss** exceeds the remaining applicable Limit of Insurance or in the event of the **Financial Impairment** of the **Insured Entity**, the Insurer will first pay **Loss** that the **Insured Individual** is legally obligated to pay that is not indemnified by the **Insured Entity** because the **Insured Entity**



Exhibit A
PRIVATUS® PLATINUM

either is not legally permitted to provide such indemnification or is unable to provide such indemnification by reason of **Financial Impairment.**

**Premium**

The **Named Insured** will pay the Premium stated in the DECLARATIONS. As may be agreed upon by the **Named Insured** and the Insurer or as otherwise provided in this Policy, the Premium may be adjusted at any time during the **Policy Period** or any extensions of the **Policy Period** based upon changes in the provisions of this Policy.

**Presumptive Indemnification**

The **Insured Entity** agrees to indemnify the **Insured Individuals** to the fullest extent permitted by law.

**Representations and Severability**

The Insurer has relied on the statements made and information in the **Application** and the accuracy and completeness of such statements and information. Such statements and information are the basis for the Insurer's issuance of this Policy, are incorporated in and constitute a part of this Policy, and have induced the Insurer to issue this policy.

If the **Application** contains any misrepresentation that either was made with the intent to deceive or materially affected either the acceptance of the risk or the hazard assumed by the Insurer, then no coverage will be provided under this Policy for any **Claims** based upon or arising out of the facts that were misrepresented, or for any **Securityholder Derivative Events, Plan Violation Events, Workplace Violence Events, Stalking Events, Enterprise Security Events, Extortion Threats,** or other covered **Events** arising out of or in connection with the facts that were misrepresented, with respect to:

1. any **Insured Individual** who knew, as of the inception of the **Policy Period**, of such facts, whether or not such **Insured Individual** knew the **Application** contained the misrepresentation; or

2. the **Insured Entity**, to the extent it indemnifies an **Insured Individual** described in item 1 above; or

3. the **Insured Entity**, if any **Insured Executive** knew, as of the inception of the **Policy Period**, of such facts, whether or not such **Insured Executive** knew the **Application** contained the misrepresentation.

For purposes of applying this condition, the knowledge of the **Insured Entity** or an **Insured Individual** will not be imputed to any other **Insured Individual.**

**Rescission**

The Insurer shall not seek to rescind this Policy or any **Coverage Part** for any reason.

**Subrogation and Recovery**

In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all the **Insured's** rights of recovery thereof, and the **Insureds** will execute and deliver all instruments and papers required and do whatever else is necessary to secure, and will do nothing to prejudice, such rights. The Insurer, however, will not exercise its right of subrogation against any **Insured Individual** unless the **Illegal Profit or Conduct** exclusion applies to such **Insured Individual.**

**Territory, Valuation and Currency**

The coverage afforded under this Policy applies anywhere in the world, where legally permissible.

If a judgment is rendered, settlement is denominated or another element of loss under this Policy is stated in a currency other than United States dollars, payment under this Policy will be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of loss is due, unless otherwise set forth in this Policy.

All monetary amounts under this Policy are expressed and payable in the currency of the United States.



**Exhibit A**
**PRIVATUS® PLATINUM**

## CRIME COVERAGE PART

Except for section and paragraph headings, all words in bold have a special meaning as set forth in the **DEFINITIONS** section in the GENERAL TERMS AND CONDITIONS. Section and paragraph headings are provided for informational purposes only and do not have special meaning.

Subject to all provisions of this **Coverage Part** and this Policy, the Insurer will provide those Coverages below for which a Limit of Insurance is stated in the DECLARATIONS.

### APPLICABILITY

Unless specifically provided otherwise in this Policy, the Coverages below apply only to direct loss to the **Insured Entity** through acts committed or events occurring at any time that is **Discovered** during the **Policy Period** or any applicable Discovery Period described in the DISCOVERY PERIOD section.

### COVERAGES

A. **Employee Theft Coverages**

1. **Theft of Insured Entity's Property Coverage**

   The Insurer will pay for loss of or damage to **Covered Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not or acting alone or in collusion with others.

2. **Theft of Client's Property Coverage**

   The Insurer will pay for loss of or damage to **Covered Property** of a **Client** located inside the **Premises** resulting directly from **Theft** committed by an identified **Employee**, whether acting alone or in collusion with others.

B. **Forgery Coverages**

1. **Forgery of Negotiable Instruments Coverage**

   The Insurer will pay for direct loss resulting from **Forgery** of any negotiable instrument, including any check, draft, promissory note, or similar written promise to pay a sum certain in **Money**, made or drawn by or drawn upon the **Insured Entity** or the **Insured Entity's** agent or purporting to have been so made or drawn.

2. **Legal Expense Coverage**

   The Insurer will pay reasonable and necessary attorney's fees and court costs incurred by or on behalf of the **Insured Entity** with the Insurer's prior written consent to defend any suit or claim brought against the **Insured Entity** to enforce payment of any negotiable instrument described in the **Forgery of Negotiable Instruments Coverage** that the **Insured Entity** has refused to pay because it was **Forged**.

3. **Forgery of Payment Card Instruments Coverage**

   The Insurer will pay for direct loss resulting from **Forgery** of any written instrument required in connection with any charge card, credit card, or debit card issued by a third party to the **Insured Entity** or any **Employee** for business purposes.

C. **Inside the Premises Coverage**

   The Insurer will pay for any of the following:

1. loss of **Money** or **Securities** located inside the **Premises** resulting directly from the **Theft**, physical disappearance, or destruction of such **Money** or **Securities**;



Exhibit A
PRIVATUS® PLATINUM

2. loss of or damage to any locked safe, vault, cash box, cash register, or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Safe Burglary**;

3. loss of or damage to **Property** located inside the **Premises** resulting directly from an actual or attempted **Robbery**;

4. loss of or damage to **Property** located inside the **Premises** in any locked safe or vault resulting directly from an actual or attempted **Safe Burglary**; or

5. damage to the **Premises** or its exterior resulting directly from an actual or attempted **Robbery** or **Safe Burglary**, but only if and to the extent the **Insured Entity** owns such **Premises** or is liable for damage to such **Premises**.

D. **In Transit Coverage**

The Insurer will pay for any of the following:

1. loss of **Money** or **Securities** that is located outside the **Premises**, in the care and custody of an armored motor vehicle company or **Messenger**, and being conveyed by the **Messenger** or armored motor vehicle company or temporarily within the living quarters of a **Messenger**, resulting directly from the **Theft**, physical disappearance, or destruction of **Money** or **Securities**; or

2. loss of or damage to **Property** that is located outside the **Premises**, in the care and custody of an armored motor vehicle company or **Messenger**, and being conveyed by the **Messenger** or armored motor vehicle company or temporarily within the living quarters of a **Messenger**, resulting directly from an actual or attempted **Robbery**.

E. **Money Order or Counterfeit Currency Fraud Coverage**

The Insurer will pay for direct loss resulting from the **Insured Entity's** good faith acceptance, during the regular course of business, and in exchange for **Merchandise**, **Money**, or services, of:

1. a money order issued or purporting to have been issued by a post office, express company, or **Financial Institution** that is not paid upon presentation; or

2. counterfeit official paper currency of any country.

F. **Computer Crime Coverages**

1. **Computer Transfer Fraud Coverage**

The Insurer will pay for loss of or loss from damage to **Covered Property** resulting directly from **Computer Transfer Fraud** that causes the transfer, payment, or delivery of **Covered Property** from the **Premises** or **Transfer Account** to a person, place, or account beyond the **Insured Entity's** control, without the **Insured Entity's** knowledge or consent.

2. **Restoration Expense Coverage**

The Insurer will pay **Restoration Expense** resulting from loss of or damage to **Information** caused directly by a **Cyber Attack**.

G. **Fraudulent Transfer Coverages**

1. **Funds Transfer Fraud**

The Insurer will pay for loss of **Money** or **Securities** resulting directly from the transfer of **Money** or **Securities** from a **Transfer Account** to a person, place, or account beyond the **Insured Entity's** control, by a **Financial Institution** that relied upon a written, electronic, telegraphic, cable, or teletype instruction that purported to be a **Transfer Instruction** but, in fact, was issued without the **Insured Entity's** knowledge or consent.



Exhibit A
PRIVATUS® PLATINUM

2. **Social Engineering Fraud Coverage**

The Insurer will pay for loss of **Money** or **Securities** resulting directly from the transfer, payment, or delivery of **Money** or **Securities** from the **Premises** or a **Transfer Account** to a person, place, or account beyond the **Insured Entity's** control by:

a. an **Employee** acting in good faith reliance upon a telephone, written, or electronic instruction that purported to be a **Transfer Instruction** but, in fact, was not issued by a **Client, Employee** or **Vendor**; or

b. a **Financial Institution** as instructed by an **Employee** acting in good faith reliance upon a telephone, written, or electronic instruction that purported to be a **Transfer Instruction** but, in fact, was not issued by a **Client, Employee** or **Vendor**.

H. **Investigation Expense Coverage**

The Insurer will pay reasonable costs incurred by or on behalf of the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer, to establish the existence and amount of each loss covered under this **Coverage Part**, but only if such costs exceed the Retention applicable to such loss.

It is a condition precedent to the Coverages afforded under this **Coverage Part** that:

1. loss is **Discovered** during the **Policy Period** or the extended period to discover loss described in the DISCOVERY PERIODS section, if applicable; and

2. notice and proof of loss is given to the Insurer in writing in accordance with the **REPORTING OF CLAIMS AND EVENTS** section in the GENERAL TERMS AND CONDITIONS.

## EXCLUSIONS

A. This **Coverage Part** does not apply to loss:

**Acts of Owners**

resulting from any fraudulent, dishonest, or criminal act by any **Owner** of the **Insured Entity** or, solely with respect to the **Theft of Client's Property Coverage**, by any **Owner** of a **Client**, whether acting alone or in collusion with others.

**Advantage**

of one **Insured Entity** to the advantage of another **Insured Entity**.

**Employees**

resulting from any fraudulent, dishonest, or criminal act by any **Employee**; except this exclusion does not apply to loss covered under the **Employee Theft Coverages**.

**Fire**

resulting from fire; provided this exclusion does not apply to damage to any safe or vault caused by the application of fire thereto for the purposes of a **Safe Burglary** or to loss of **Money** or **Securities**.

**Intellectual Property and Confidential Information**

1. of or loss resulting from theft, disappearance, destruction, release, or disclosure of, or access to, any trade secrets, intangible property or intellectual property; or

2. of or loss resulting from theft, disappearance, destruction, release, or disclosure of, or access to, any confidential information of any kind, including any password, or any non-public, personal, or personally identifiable information; except this item b does not apply to loss covered under the **Theft of Insured Entity's Property Coverage** that is enabled by the theft of such information.



**Indirect or Consequential Loss**

that is indirect or consequential, including loss of: income, earnings, or profit not realized as the result of a covered loss; fees, costs, or other expenses to establish the existence or amount of covered loss; fees, costs, or other expenses of any party; or fees, costs, or other expenses incurred by the **Insured Entity** in defending or prosecuting any legal proceeding or claim; except this exclusion does not apply to expenses covered the **Legal Expense Coverage**, **Restoration Expense Coverage**, or **Investigation Expense Coverage**.

**Inventory Shortage**

or any portion of loss, the proof of which as to its existence or amount is dependent solely upon an inventory computation or profit and loss computation. This exclusion does not preclude the **Named Insured** from offering the **Insured Entity's** inventory records and an actual physical count of inventory as evidence of the amount of loss if the **Named Insured** establishes by other means, wholly apart from such computations or physical count, that a loss has occurred.

**Kidnap, Ransom, or Extortion**

or damage resulting directly or indirectly from kidnap, ransom, or other extortion payment surrendered to any person as a result of a threat to cause bodily harm to any person or damage to any property.

**Nuclear Hazards**

resulting directly or indirectly from any nuclear reaction, nuclear radiation, radioactive contamination, or any related act or incident.

**Premises**

from damage to any buildings; except this exclusion does not apply to loss covered under Item 5 in the **Inside the Premises Coverage**.

**Records**

of or damage to manuscripts, records, accounts, microfilms, tapes, or any other records, whether written or electronic, or costs to reproduce any information contained in any such record; except this exclusion does not apply to expenses covered under the **Restoration Expense Coverage**.

**Surrender of Property**

resulting from the transfer or surrender of any property in any exchange or purchase with a third party not in collusion with the **Insured Entity** or **Employee**; except this exclusion does not apply to loss covered under the **Money Order or Counterfeit Currency Fraud Coverage** or **Fraudulent Transfer Coverages**.

**Trading**

resulting directly or indirectly from trading of **Covered Property**, whether in the **Insured Entity's** or **Client's** name or in a genuine or fictitious account; except this exclusion does not apply to direct loss caused by **Theft** committed by an **Employee** that results in improper financial gain to such **Employee**. Salary, commissions, fees, or other emoluments, including promotions, raises, and incentive compensation associated with employment, paid by the **Insured Entity** to such **Employee**, will not constitute improper financial gain.

**War and Government Acts**

resulting directly or indirectly from declared or undeclared war, civil war, invasion, hostilities or warlike operations (whether war is declared or not), strike, lock-out, riot, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power, or the confiscation, nationalization, or destruction of, or damage to, property under the order of government or other public authority.



**Exhibit A**
**PRIVATUS® PLATINUM**

B. The **Inside the Premises Coverage** and **In Transit Coverage** do not apply to loss resulting from **Forgery**, fraud, or the use of any **Computer System** or to loss of or loss from damage to any motor vehicle, trailer, or semitrailer or any equipment or accessories attached thereto.

C. The **In Transit Coverage** does not apply to loss if, at the time the property was conveyed to the **Messenger** or armored motor vehicle company, the **Insured Entity** knew of any threat related to such loss.

---

## SINGLE LOSSES AND RETENTIONS

### Single Losses

1. All loss resulting from any act, acts, or series of acts or events, whether or not related, committed by one or more persons, or by persons or a group of persons acting together, whether identified or not, will be treated as a single loss.

2. For purposes of the **Employee Theft Coverages**, all loss resulting from a single act or from separate acts or a series of acts, whether or not related, committed by one or more **Employees**, whether alone or in collusion with others, will be treated as a single loss.

3. For purposes of the **Forgery Coverages**, all loss resulting from a single act or acts committed by one or more persons, whether involving one or more covered instruments, will be treated as a single loss.

4. If two or more **Insured Entities** are involved in a loss, the most the Insurer will pay for such loss will not exceed the highest Limit of Insurance applicable to such loss.

5. Regardless of the number of years this insurance remains in effect and the total premium due or paid, the amount the Insurer will pay for a loss will not be cumulative from year to year or from policy period to policy period.

### Retentions

1. No Retention applies to loss to any **ERISA Plan** that is covered under the **Theft of Insured Entity's Property Coverage**.

2. If, after payment of a retention or deductible, the **Insured Entity** receives payment under another policy or bond for loss also covered under this **Coverage Part**, the applicable Retention under this **Coverage Part** for such loss will be reduced by the amount of such retention or deductible paid under the other policy or bond.

---

## DISCOVERY PERIODS

If this Policy is cancelled or nonrenewed, the Insurer will pay for covered loss:

1. to the **Insured Entity** (other than an **ERISA Plan**) if such loss is **Discovered** within 90 days after the effective date of cancellation or termination; and

2. to any **ERISA Plan** if such loss is **Discovered** within one year after the effective date of cancellation or termination.

These Discovery Periods terminate immediately upon the inception date of any other insurance obtained by the **Insured Entity** replacing, in whole or in part, the insurance afforded under this **Coverage Part**, regardless of whether such other insurance provides coverage for loss occurring prior to its effective date.

---

## CONDITIONS

### Authorization of Named Insured

The **Named Insured** will act on behalf of all **Insured Entities** with respect to providing notice and furnishing proof of loss, filing any claim, adjusting the amount of loss submitted, receiving payment of loss (except loss to an **ERISA Plan**) and enforcing payment of loss.



**Exhibit A**
**PRIVATUS® PLATINUM**

**Ownership and Interests Covered**

1.  The property covered under this **Coverage Part** is limited to:

    a.  property the **Insured Entity** owns, leases, or holds for others; or

    b.  property the **Insured Entity** is legally liable for and was legally liable for prior to the date the loss occurred.

2.  This **Coverage Part** only covers direct loss to the **Insured Entity** unless specifically provided otherwise in this **Coverage Part**.

3.  This **Coverage Part** is for the benefit of the **Named Insured** only and provides no rights or benefits to any other person, organization, **Insured Entity**, or joint payee.

**Payments**

The Insurer will pay loss to any **ERISA Plan** directly to such **ERISA Plan**. All other loss due under this Policy will be paid solely to the **Named Insured** or jointly to the **Named Insured** and any other payee as directed by the **Named Insured**.

**Records**

The **Insured Entity** must keep records of all **Covered Property** so the Insurer can verify the amount of any loss.

**Termination of Coverage**

1.  The **Policy Period** will terminate immediately with respect to an **Employee** upon **Discovery** of:

    a.  any unlawful taking of property or any criminal, fraudulent or dishonest act committed by such **Employee** while employed by the **Insured Entity**; or

    b.  any criminal, fraudulent or dishonest act committed by such **Employee** prior to his or her employment with the **Insured Entity** involving any property valued at $25,000 or more.

2.  The **Policy Period** will terminate immediately with respect to any **Insured Entity** that ceases to be a **Subsidiary** or Insured Joint Venture of the **Named Insured**.

3.  Coverage under this **Coverage Part** will terminate immediately for any loss occurring after the voluntary liquidation or dissolution of the **Named Insured**.

**Valuation**

1.  For covered loss of **Money**, the Insurer will pay only up to and including the face value of **Money** on the date the loss was **Discovered**.

2.  For covered loss of **Securities**, the Insurer will pay, at the Insurer's sole option:

    a.  the cost to replace **Securities** or up to and including the closing price of **Securities** on the business day immediately preceding the date the loss was **Discovered**; provided in either case, the **Named Insured** must assign its rights, title, and interest in the **Securities** to the Insurer; or

    b.  the cost of any lost instrument bond required in connection with issuing duplicate **Securities**.

3.  For covered loss of or damage to **Property**, the Insurer will pay the least of:

    a.  the price paid by the **Insured Entity** for the **Property**;

    b.  the cash value of **Property** on the date the loss was **Discovered**; or

    c.  the cost to repair or replace **Property** with that of similar quality and value as of the date on which the **Named Insured** furnished proof of loss.



**Exhibit A**

**POLICYHOLDER NOTICE**

**ECONOMIC AND TRADE SANCTIONS**

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the Office of Foreign Assets Control (OFAC).

THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") OF THE US DEPARTMENT OF THE TREASURY ADMINISTERS AND ENFORCES ECONOMIC AND TRADE SANCTIONS BASED ON US FOREIGN POLICY AND NATIONAL SECURITY GOALS AGAINST TARGETED FOREIGN COUNTRIES AND REGIMES, TERRORISTS, INTERNATIONAL NARCOTICS TRAFFICKERS, THOSE ENGAGED IN ACTIVITIES RELATED TO THE PROLIFERATION OF WEAPONS OF MASS DESTRUCTION, AND OTHER THREATS TO THE NATIONAL SECURITY, FOREIGN POLICY OR ECONOMY OF THE UNITED STATES.

WHENEVER COVERAGE PROVIDED BY THIS POLICY WOULD BE IN VIOLATION OF ANY U.S. ECONOMIC OR TRADE SANCTIONS, SUCH COVERAGE SHALL BE NULL AND VOID.

FOR MORE INFORMATION, PLEASE REFER TO:

*HTTPS://WWW.TREASURY.GOV/RESOURCE-CENTER/SANCTIONS/PAGES/DEFAULT.ASPX*



**Exhibit A**

| Endorsement No. | Effective Date of Endorsement | Policy Number | Additional Premium |
|---|---|---|---|
| 1 | 12:01 a.m. on July 1, 2017 | MCN623938/01/2017 | N/A |

### CANCELLATION AND NONRENEWAL ENDORSEMENT – MISSISSIPPI

It is agreed that:

Except as specifically set forth herein, any Cancellation or Nonrenewal provision in this policy is replaced by the following. If the policy does not contain a Cancellation and/or Nonrenewal provision, the following is added to the policy:

1. Cancellation

   a. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation. Such advance notice of cancellation should be mailed or delivered to the address indicated in the Declarations under the item entitled Notices to Insurer.

   b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      (1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      (2) 30 days before the effective date of cancellation if we cancel for any other reason.

   c. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

   d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

   e. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   f. If notice is mailed, proof of mailing will be sufficient proof of notice

2. Nonrenewal

   a. If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured at least:

      (1) 10 days before the effective date of nonrenewal, if the nonrenewal is due to nonpayment of premium; or

      (2) 30 days before an anniversary date or the expiration date of the policy, if the nonrenewal is for any other reason.

   b. The notice of nonrenewal will be mailed or delivered to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

As used herein, "us" and "we" refers to the insurance company named on the Declarations.

As used herein, "you", "your" or "named insured" refers to the person or entity first named as such on the Declarations.

If any provision of the policy contains cancellation or nonrenewal terms that are more favorable to the insured than those provided in this endorsement, then, except where prohibited by applicable state law, the more favorable terms control.

AXIS 801 MS (06-15)

Page 1



**Exhibit A**

All other provisions of the policy remain unchanged.